**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CLAUDE WENDELL BELLAMY,
*Defendant-Appellant.*

No. 00-4662

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES LARRY BELLAMY,
*Defendant-Appellant.*

No. 00-4663

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ALVIN GLENN BELLAMY,
*Defendant-Appellant.*

No. 00-4664

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CR-99-49-F)

Argued: October 30, 2001

Decided: January 22, 2002

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Wayne Buchanan Eads, Raleigh, North Carolina, for Appellant Larry Bellamy; Terry F. Rose, Smithfield, North Carolina, for Appellant Claude Bellamy; Joseph Michael McGuinness, THE MCGUINNESS LAW FIRM, Elizabethtown, North Carolina, for Appellant Alvin Bellamy. John Samuel Bowler, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** John Stuart Bruce, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Carrie Clodfelter, Third-Year Law Student, Nancy Herrera, Third-Year Law Student, Jennifer Lindow, Third-Year Law Student, Erin Norris, Third-Year Law Student, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Three brothers, Claude, Larry, and Alvin Bellamy, were convicted by a jury of conspiracy to commit bank robbery, armed bank robbery, and related gun violations, all arising from a string of nine bank robberies. On appeal the Bellamys raise a number of issues, including ones relating to sufficiency of the evidence, denied motions for severance, identification testimony, the admission of certain physical evidence, and sentencing. Finding no reversible error, we affirm.

I.

A.

The evidence developed and introduced by the government included the following. From 1991 to 1998 the Bellamy brothers

robbed nine banks in North Carolina and South Carolina. (Ironically, two of the Bellamys were connected to law enforcement: Larry was a Lieutenant in the Myrtle Beach, South Carolina, Police Department, and Claude had worked as an officer in several police departments.) The trail of evidence from the last bank robbery — the one on January 2, 1998, at Branch Banking & Trust (BB&T) in Calabash, North Carolina — led police to the Bellamy brothers. On that day, Henry Anderson, a bank customer, pulled up to the drive-thru window and noticed a robber, masked and armed, inside the bank. Anderson left the bank property immediately and parked at an adjoining business, thinking that he might be able to ascertain the getaway route. Anderson then noticed, and became suspicious about, a small pickup that was parked so that its occupant had a view of the bank's parking lot. He wrote down the license plate number of the pickup. Then, he saw two masked men leave the bank and get into a red Chevrolet Blazer. The Blazer and the pickup sped off "nose to tail," and Anderson followed them long enough to verify the license plate number of the pickup. Anderson gave the number to the police, who located the pickup at Alvin's house later that day. Another man, Glen Westraad, who was sitting in a parked vehicle in the bank's parking lot right before the robbery, linked the red Blazer and the pickup and identified Larry Bellamy. As Westraad sat in the parking lot, a red Blazer pulled in beside him, and he and the driver looked directly into each other's faces. Westraad also noticed that the driver was wearing a black and white checkered jacket. The Blazer left the parking lot and circled the bank three times; the Blazer stopped twice so that its occupants could speak with the driver of a pickup. Westraad identified Larry as the driver of the red Blazer who wore the checkered coat. A forensic expert concluded that the checkered coat found in Claude's home and the checkered coat worn by one of the robbers caught on the bank's surveillance film were one and the same. A set of GM keys were found at Claude's Little River, South Carolina, home, and the keys fit a red Blazer parked in the garage of his second home in Aberdeen, North Carolina.

Using the January 2, 1998, robbery as a starting point, the FBI was able to link the Bellamys to nine bank robberies in all. The FBI made the links by identifying distinct characteristics that were common in more than one of the robberies. These common characteristics included the following. First, bank surveillance photographs showed

that the smaller of two inside robbers wore the same off-brand sport shoes with distinctive markings in three of the first four robberies. The photographs showed that the smaller robber (who turned out to be Larry) controlled the floor area of the bank while the large, over-weight robber (who turned out to be Claude) went behind the counter. Second, the smaller robber wore a distinctive western-style ski jacket in four of the robberies. Third, "Members Only"-style jackets were worn in three consecutive robberies. In the first of these robberies, the smaller robber wore one of these jackets; in the second robbery, both robbers wore one; and in the third robbery, the large robber wore one. Two of these jackets were found in Larry's home, and one was found at Claude's. Fourth, three bank tellers who were robbed twice said that on both occasions they were robbed by the same men. Fifth, in two of the robberies, vehicles owned by the Bellamys were used. Claude's Chevrolet Camaro was used in one, and Claude's Blazer and Alvin's pickup were used in another. (In several of the robberies, however, stolen vehicles or license tags were used.) Sixth, a large green draw-string bag was used to gather the cash in four of the rob-beries. Seventh, the large robber used a holster in two of the rob-beries, and one surveillance photograph showed a "tilt-forward" holster. A black holster, of tilt-forward design, was recovered from Claude's home.

The surveillance system in one of the robbed banks used still pho-tographs on 35 mm film, resulting in higher quality images than those captured on videotape. The quality of that film captured an overly large eye opening in the large robber's ski mask, revealing his skin, his browline, and the line of his nose. This allowed the government to take a current photograph of Claude and make a side-by-side com-parison with the surveillance photograph. A similar comparison was also made using a surveillance photograph of the smaller robber and a separate photograph of Larry. These comparison photographs were set side-by-side and shown to the jury.

An officer who had worked closely with Larry in the Myrtle Beach Police Department reviewed the surveillance photographs and said, "I'm confident that those pictures show that Larry Bellamy was involved with the robberies." A second fellow officer was "about 99 percent sure" that Larry was the smaller robber in the photographs, and a third officer was "at least 90 percent" sure.

Finally, there was further evidence against Alvin. A witness unexpectedly identified Alvin at trial as the robber she had seen coming out of Davis National Bank in Myrtle Beach, South Carolina, on April 24, 1992. In addition, statements Alvin made to an FBI agent the night of the January 2, 1998, BB&T robbery were incriminating because of the way his story shifted in response to information provided by the agent. Alvin began with the assertion that, after going out for coffee early in the morning, he had been home all day. His story changed each time he was confronted with statements by his brothers or with other evidence. Eventually, Alvin admitted that his pickup had been at the BB&T bank site that day, but he said he had simply pulled off the road there to retrieve insurance papers that had fallen on the floorboard. Last, on January 2, 1998, Alvin was carrying $117 in pocket money, all in five and one dollar bills. Earlier, in the June 27, 1996, robbery of NationsBank in Calabash, North Carolina, at least $12,000 in bundles of fives and ones had been stolen.

## B.

A five-count federal indictment handed down on July 20, 1999, charged all three Bellamys with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count One); charged Claude and Larry with the 1996 armed robbery of a bank in Calabash, North Carolina, in violation of 18 U.S.C. §§ 2113 and 2 (Count Two); charged Claude and Larry with the use of handguns during a crime of violence, that is, the robbery charged in Count Two, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Three); charged all three Bellamys with the 1998 armed robbery of another bank in Calabash, in violation of 18 U.S.C. §§ 2113 and 2 (Count Four); and charged all three Bellamys with the use of handguns during a crime of violence, that is, the robbery charged in Count Four, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Five). After a two-week trial, during which the government called about 70 witnesses, the jury found all three defendants guilty as charged. Claude and Larry were each sentenced to 593 months in prison, and each was ordered to pay $359,582 in restitution. Alvin got a prison sentence of 123 months and a $7,000 fine. All three Bellamys appeal.

## II.

Claude and Alvin Bellamy both argue that there was insufficient evidence to support their convictions. We must sustain the jury's ver-

dict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). The evidence, including that recounted in part I.A., *supra*, is sufficient to support the guilty verdicts returned by the jury against Claude and Alvin.

III.

Claude and Alvin Bellamy argue that the district court abused its discretion in denying their individual motions to sever. Alvin in particular argues that the disproportionate amount of evidence against his brothers led to prejudicial spillover against him. The trial court denied the motions to sever because the parties anticipated 140 witnesses over two weeks and "the burden on judicial resources and public funds would be too great [to justify severance] . . . especially in light of the prophylactic effect of cautionary instructions and effective representation."

We conclude, for several reasons, that the district court did not abuse its discretion in denying Claude's and Alvin's motions to sever. First, judicial economy is an appropriate consideration in deciding to deny severance. *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995). Second, "[i]t is well established that '[b]arring special circumstances, individuals indicted together should be tried together.'" *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1995) (quoting *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981)). Third, neither Claude nor Alvin has demonstrated actual prejudice resulting from the joint trial. *Reavis*, 48 F.3d at 767 (party moving for severance must establish that actual prejudice would result from a joint trial). The district court carefully instructed the jury to consider separately the evidence relating to each of the three defendants:

> As you know there are three defendants being tried in this case. I instruct that you must be careful to give separate consideration to the evidence supporting or refuting each charge against each individual defendant. In considering each defendant separately, do not think of the defendants as a group, or assume that if one defendant is found guilty of a particular charge, that another must also be guilty. Instead, you may return a verdict of guilty on any charge only if the

evidence proves all the elements of that particular charge against that individual defendant beyond a reasonable doubt.

The evidence, when considered separately as the district court instructed, was ample to convict both Claude and Alvin. *See* part II, *supra*. Finally, Alvin's argument that there was disproportionally more evidence of illegal activity against his brothers did not require a severance. As we have explained, "A defendant is not entitled to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other." *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001) (quoting *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999)). In sum, it was proper to try the three Bellamys together.

IV.

Alvin Bellamy argues that the district court erred in denying his motion to strike one witness's unexpected in-court identification of him. Witness Connie Parish surprised both the prosecution and the defense when she identified Alvin, rather than Claude, as the robber she had seen coming out of the bank and getting into a truck during the April 24, 1992, robbery at Davis National Bank in Myrtle Beach, South Carolina. Count One, the conspiracy count, listed the April 24, 1992, robbery as one of the overt acts, but it specified Claude and Larry as the inside robbers.

Alvin first argues that this unexpected identification resulted in an impermissible variance between the indictment and the proof. *See United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) ("When the evidence at trial differs from what is alleged in the indictment, then a variance has occurred."). Alvin was charged with a conspiracy that was allegedly carried out by overt acts involving Larry and Claude as the inside robbers. Alvin was not named as an inside robber in any of the nine overt acts of robbery alleged, yet Parish pegged him as an inside robber in the April 24, 1992, job. A variance "violates a defendant's rights and requires reversal only if it prejudices him." *Id.* Prejudice occurs if the variance "surpris[es the defendant] at trial and hinder[s] the preparation of his defense." *Id.* In other words, "the focus is . . . upon whether the indictment provided the defendant with

adequate notice to defend the charges against him." *United States v. Redd*, 161 F.3d 793, 795 (4th Cir. 1998). Any variance here was not prejudicial because Alvin was on notice that he was considered to be one of the three actors who carried out the conspiracy. The indictment alleged that "the conspiracy was carried out by the repeated use of facial masks, gloves, handguns, *and a second motor vehicle employed in either a look-out or escape capacity. . . .* In each robbery, two of the defendants entered the banks . . . ." (Emphasis added.) While Alvin was not listed as one of the two who entered the bank on April 24, 1992, he was on notice that the government considered him to be the lookout man. In fact, his lawyer stated that the government "told me so many times that we were in a lookout position in this case." Because Alvin knew that he was charged as a co-conspirator and that the government would try to prove he was on the robbery scene on April 24, 1992, as a lookout, he cannot show prejudice. In any case, a defendant's particular role in the conspiracy is not an essential element of the conspiracy crime, and "notice-related concerns are not implicated when the alleged variance does not affect an essential element of the offense." *Redd*, 161 F.3d at 796. Finally, Alvin's defense was not hindered to a prejudicial degree because his lawyer had a chance to cross-examine Parish thoroughly, and Alvin has not suggested how his lawyer might have been more effective with advance notice of what Parish would say.

Alvin also argues that Parish's testimony should have been excluded because it was unreliable. The reliability of eyewitness identification testimony becomes an issue if the defendant proves that the identification procedure was "impermissibly suggestive." *Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994). Although unsolicited, Parish's identification was arguably the result of an "impermissibly suggestive" procedure. Parish identified Alvin for the first time when he was sitting in court in a defendant's chair, which meant that the identification was made without the protection of a non-suggestive police line-up. An identification made for the first time in court can be inherently suggestive. *See, e.g.*, *United States v. Archibald*, 734 F.2d 938, 942-43 (2d Cir. 1984) ("The in-court identification procedure utilized here was so clearly suggestive as to be impermissible, however traditional it may be. . . . Indeed, the suggestiveness of the situation was clearly indicated at trial. One of the three witnesses who identified [defendant] stated on cross-examination that she 'had the feeling that

he would be sitting next to' the defense lawyer in the courtroom. It was an obviously suggestive situation."); *United States v. Williams*, 436 F.2d 1166, 1168 (9th Cir. 1970) ("When asked to point to the robber, an identification witness — particularly if he has some familiarity with courtroom procedure — is quite likely to look immediately at the counsel table, where the defendant is conspicuously seated in relative isolation. Thus the usual physical setting of a trial may itself provide a suggestive setting for an eyewitness identification."); *United States v. Sebetich*, 776 F.2d 412, 420 (7th Cir. 1985) (internal quotations and citations omitted) ("[A]n in-court identification during which the defendant is seated next to defense counsel is obviously suggestive to witnesses. Therefore, in exercising its discretion the court must ensure that an in-court identification is not merely a show-up.").

The Supreme Court has listed five factors for courts to consider in evaluating the reliability of identification testimony: (1) the witness's opportunity to see the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and (5) the time between the crime and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 114-15 (1977). While Parish identified Alvin for the first time almost eight years after the robbery, she testified that she saw the robber face-to-face at the time of the crime and she "thought that when this happened I would never ever forget the face." Furthermore, as already mentioned, Alvin's lawyer had ample opportunity to cross-examine Parish about her identification. All in all, we conclude that the identification was reliable.

## V.

Larry Bellamy argues that the district court erred in denying his motion to suppress evidence of his identification by Glen Westraad, who identified Larry in a pretrial photographic array and later at trial. Specifically, Westraad identified Larry as the driver of a red Blazer parked at the bank immediately before the January 2, 1998, robbery. To successfully challenge an identification, a defendant "must prove that the identification procedure was impermissibly suggestive. Once this threshold is crossed, the court then must determine whether the identification was nevertheless reliable under the totality of the cir-

cumstances." *Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994) (citations omitted).

In arguing that the photo array was impermissibly suggestive, Larry relies on the testimony of his expert, Dr. Gary Long, a social psychologist. During the suppression hearing Dr. Long opined that the photo array was suggestive because only one of five photos reasonably resembled Larry, the suspect, who was in the sixth photo. Four of the photos were of men who had different facial hair, different hairstyles, or wore eyeglasses. Dr. Long's opinion, however, was not based on all of the facts because Westraad was presented with twelve rather than six photographs. Dr. Long did not analyze six of the photographs. Thus, Larry did not prove that the photo array was impermissibly suggestive. In any case, when considered in light of the five *Manson* factors listed in part IV, *supra*, Westraad's identification of Larry was reliable. Westraad had seen Larry in good lighting, from about one car width away, and under non-stressful conditions. Also, he had paid enough attention to remember that Larry was wearing a black and white checkered jacket. Finally, Westraad picked out Larry almost immediately in the photo array, saying he was 95 percent certain about his identification. In these circumstances, the district court did not err in denying Larry's motion to suppress his identification by Westraad.

## VI.

Larry Bellamy contends that the district court abused its discretion by excluding his eyewitness identification expert, Dr. Gary Long, as a trial witness. Dr. Long would have testified that Glen Westraad's identification of Larry was unreliable due to the impermissibly suggestive photographic array discussed above. The district court excluded Dr. Long's testimony for two reasons: the testimony would be based on a mistaken assumption and it "would not be helpful to the jury in deciding any issues before it at trial."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that expert testimony be both reliable and helpful to the jury. The reliability of Dr. Long's testimony could not be assured because it would have been based in part on a mistaken assumption. Dr. Long believed that Westraad made the identification after viewing

six photographs, when in fact he had looked at twelve. In any case, except for narrow circumstances, expert testimony on the reliability of witness identification "almost by definition, can be of no assistance to a jury. . . . [J]urors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." *United States v. Harris*, 995 F.2d 532, 534-35 (4th Cir. 1993). Larry argues that this case falls under the "narrow circumstances" exception that allows for expert testimony because there was a time lag of over two years between the time of the robbery and the time of the in-court identification. This argument fails because only fifteen days passed between the robbery and the photo array identification Dr. Long would have criticized. Thus, *Harris*'s general rule applies, and the district court properly excluded the expert's testimony about Westraad's eyewitness identification of Larry.

## VII.

The three Bellamy brothers contend that a *Brady* violation occurred because the government failed to provide them with copies of their voice exemplars that might have been exculpatory. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process"). The voice exemplars were tape recordings of the Bellamy brothers' voices made by the government for identification purposes. The Bellamys do not explain how their own voice exemplars would have had any exculpatory value. In any event, the government's possession of the exemplars did not trigger *Brady* obligations. *Brady* covers evidence not available to a defendant, and here the Bellamys could have made exemplars of their own voices. *See, e.g.*, *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (when the exculpatory information is available to the defendant, the defendant is not entitled to the benefit of the *Brady* rule); *Stockton v. Murray*, 41 F.3d 920, 927 (4th Cir. 1994) (*Brady* does not compel the disclosure of evidence available to the defendant from other sources). There was no *Brady* violation.

## VIII.

Claude Bellamy argues that the seizure of a set of GM keys from his home during a consensual search was improper because the evi-

dentiary value of the keys was not immediately apparent as required under the plain view doctrine. As it turned out, the keys fit a red Chevrolet Blazer found later in the garage of another house owned by Claude. (Of course, a red Chevrolet Blazer was used in the robbery committed earlier on the day the keys were found.) When he made his pretrial motion to suppress, Claude argued that the keys were seized during a search conducted without consent or a warrant. The district court concluded, and Claude no longer disputes, that he "freely agreed to permit the officers to search his house, stating that they could look anywhere they wanted to look." A motion to suppress must be made before trial, and the failure to include a particular ground for relief constitutes a waiver of that ground. Fed. R. Crim. P. 12(b)(3) & (f); *United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997). The government contends that because Claude failed to argue specifically in his pretrial motion that the evidentiary value of the keys was not immediately apparent to the officers, the argument is waived. We consider Claude's argument nevertheless, and we conclude that the seizure of the keys was proper under the plain view doctrine. That "doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997). The GM keys were found in plain view during a consensual search. An FBI agent conducting the search knew that a late-model Chevrolet Blazer had been used in the bank robbery earlier that day, and the keys appeared to belong to a late-model GM vehicle. After the agent questioned Claude about the keys, their incriminating character became even more apparent. *See United States v. Cotton*, 261 F.3d 397, 410 (4th Cir. 2001) (noting that questioning during lawful encounter assisted officers in realizing that incriminating character of an item was immediately apparent), *cert. granted on other grounds*, 70 U.S.L.W. 3348 (U.S. Jan. 4, 2002) (No. 01-687). When the agent asked Claude about the keys, he said they were not his. When Claude was asked why he kept them, he responded that he had a key collection. When Claude was asked to show the agent his key collection, Claude produced one key. With this information, all of the elements of the plain view doctrine were satisfied, and the seizure of the keys was appropriate.

IX.

Claude Bellamy's sentence was enhanced, under U.S.S.G. § 2B3.1(b)(3)(A), by two levels for bodily injury he inflicted on bank teller Sandra Campbell during the February 14, 1991, robbery of First Atlantic Bank in Little River, South Carolina. Claude maintains that Campbell's injuries were not serious enough to count as bodily injury under the Guidelines.

"'Bodily injury' means any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1 cmt. n.1(b) (2000). "[T]o to be 'significant' an injury need not interfere completely with the injured person's life but cannot be wholly trivial and, while it need not last for months or years, must last for some meaningful period. . . . On the other hand, those injuries that are either momentary, with no lasting effects, or wholly trivial are not 'significant.'" *United States v. Lancaster*, 6 F.3d 208, 209-10 (4th Cir. 1993). Examples of "significant" bodily injury are "redness and puffiness in face and ringing in ear that lasted for hours" and "swelling and pain in cheek that lasted for one week." *Id.* at 209.

Campbell, the teller, testified at trial that she was grabbed around the neck, dragged across the bank lobby, thrown on the floor, and kicked repeatedly in the foot. The presentence report (PSR) added that "[d]uring the assault, Campbell struck her face on either a telephone or the defendant's gun, causing a bruise to her face." Claude objected to the PSR's recommended two-level increase, stating that "there has been no evidence which confirms that Sandra Campbell's head was struck or that her head was bruised." Claude, however, did not offer any information to refute the PSR's specific findings about Campbell's injury. "A mere objection to the finding in a presentence report is not sufficient. . . . Without an affirmative showing that the information is inaccurate, the court is free to adopt the findings of the [PSR] without more specific inquiry or explanation." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (quotations and citations omitted). Because Claude failed to make an affirmative showing of inaccuracy, the district court was free to adopt the PSR's findings concerning Campbell's bodily injury, and it did so. The court did not err in concluding that Campbell's bodily injury met the substantial

injury threshold, and that was sufficient to support the two-level increase under § 2B3.1(b)(3)(A).

X.

Claude Bellamy argues that the district court erred by not using U.S.S.G. § 3D1.2(b) to group together into a single group the substantive counts (Counts Two and Four) and the conspiracy count (Count One). The conspiracy count listed as overt acts nine armed bank robberies that were proved at trial. Counts Two and Four charged, as independent crimes, the robberies listed in Count One as overt acts 7 and 9.

Guidelines § 3D1.2 allows certain closely related counts to be grouped. In particular, § 3D1.2(b) allows grouping "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Application Note 4 says, "[w]hen one count charges a conspiracy or solicitation, and the other charges a substantive offense that was the sole object of the conspiracy or solicitation, the counts will be grouped together under subsection (b)." U.S.S.G. § 3D1.2, cmt. n.4 (2000). For example, when "[t]he defendant is convicted of one count of conspiracy to commit extortion and one count of extortion for the offense he conspired to commit[,] [t]he counts are to be grouped together." *Id.*

Here, however, § 3D1.2(b) does not permit the grouping of Counts One, Two and Four together into one group. The Guidelines assume a single victim for grouping under § 3D1.2(b). So even if there is a common scheme, as Claude contends, multiple counts with different victims cannot be grouped under the plain language of § 3D1.2(b). The proper way to group Claude's convictions is explained in Application Note 8 of the commentary to § 3D1.2:

> A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. . . . Then apply the ordinary grouping rules . . . . Example: The

defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant were convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; (4) conspiracy to commit offense C. Count (1) and Count (2) are grouped together under § 3D1.2(b).

U.S.S.G. § 3D1.2, cmt. n. 8 (2000). *See also* U.S.S.G. § 1B1.2(d) (2000) ("A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.")

Applied to Claude, this means that for grouping purposes his conspiracy conviction should be treated as nine separate conspiracy convictions, one for each of the nine overt acts of robbery. Consequently, the district court was correct to end up with nine groups for the conspiracy count, one for each of the underlying robberies. The district court did group to the extent required by U.S.S.G. § 3D1.2(b). Because the robberies charged as substantive offenses in Counts Two and Four were the same robberies that formed the bases for overt acts 7 and 9 of the conspiracy count, the district court grouped the substantive counts with their corresponding overt acts. As no other grouping was proper, Claude's grouping argument fails.

## XI.

Larry and Claude Bellamy both contest on various grounds their final offense level of 38 for Counts One, Two, and Four. According to U.S.S.G. § 3D1.1, there are three steps in arriving at the combined offense level for a multiple-count conviction. First, the counts must be grouped. Most of Claude's complaints are aimed at this step; and, as we have already concluded (*see* part X, *supra*), the district court properly found at least nine separate groups. Second, the offense level for each group must be determined. Third, the combined offense level must be determined by applying the rules specified in § 3D1.4. (It is undisputed that Counts Three and Five are not taken into account in this step, according to § 3D1.1(b).).

Section 3D1.4 states that the combined offense level is determined by starting with the offense level of the group with the highest offense level. Additional offense levels are added based on the number of "units" assigned to the remaining groups. Here, Count One had the highest offense level: 32. Larry's and Claude's other groups added up to nine units. The § 3D1.4 table dictates that for five or more units, the offense level is to be increased by five, which brings the offense level to 37 for Larry and Claude.

Larry complains that the district court counted an unindicted robbery as one group, which violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). However, even if that robbery is ignored, there is a total of eight units, more than enough to raise the offense level by five. This still yields a combined offense level of 37.

Finally, the district court made a one-level upward departure. The departure is encouraged by the § 3D1.4 commentary, which states, "[i]nasmuch as the maximum increase provided in the guidelines is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 units." U.S.S.G. § 3D1.4 cmt. (2000). Larry contends that this upward departure was impermissibly based on his violation of the oath of office he took as a police officer. Even assuming that this factor was not a proper basis for departure, the district court very clearly grounded its departure on language in the commentary. In its written judgement, the court said, "The court notes that a maximum of five units may be counted under § 3D1.4. However, the instant offense involves nine units. Therefore, as suggested by Commentary to § 3D1.4, the court finds it necessary to depart upwardly one level to offense level 38." Nine, or even eight, units are significantly more than needed to trigger the maximum increase provided for in § 3D1.4. Accordingly, the district court did not abuse its discretion in making the upward departure encouraged by the commentary.

## XII.

Larry Bellamy argues that the district court erred in imposing consecutive sentences for Counts Three and Five, both § 924(c) violations, based on one predicate crime, the Count One conspiracy charge. Larry is wrong. Consecutive § 924(c) sentences may be

imposed based on the same predicate offense. *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994). In any event, the § 924(c) offenses here were not based on the same predicate crime. Instead, each § 924(c) count listed a separate bank robbery offense as its predicate: Count Three listed Count Two as its predicate offense, and Count Five listed Count Four.

### XIII.

Alvin Bellamy argues that the district court erred in denying his motion for a new trial. In that motion Alvin contended that the evidence against him was insufficient and that Connie Parish's identification testimony against him was inadmissible. As we have already held, the evidence was sufficient for the jury to convict Alvin, and Parish's identification was properly admitted. Accordingly, the district court did not abuse its discretion in denying Alvin's motion for a new trial. Finally, there was no cumulative error that deprived Alvin of a fair trial.

### XIV.

For the foregoing reasons, we affirm the convictions and sentences of Claude Bellamy, Larry Bellamy, and Alvin Bellamy.

*AFFIRMED*