**Montoyae Dontae SHARPE, Petitioner,**

v.

**Michael T.W. BELL, Superintendent of Pender Correctional Institution, Respondent.**

No. 5:04–HC–886–BO.

United States District Court, E.D. North Carolina, Western Division.

Jan. 7, 2009.

W. Gregory Duke, Greenville, NC, for Petitioner.

Clarence J. DelForge, III, N.C. Dept. of Justice, Raleigh, NC, for Respondent.

## ORDER

### TERRENCE WILLIAM BOYLE, District Judge.

This matter arises from Sharpe's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Sharpe was tried and convicted of the non-capital first-degree murder of George Radcliffe at the July 24, 1995 Criminal Session of the Superior Court of Pitt County. He was sentenced to life imprisonment. The court has previously entered an order resolving questions about the timeliness of the petition and procedural bars to the claims raised therein. Having found that petitioner's claim of ineffective assistance is properly before the court on the merits, the only matter now remaining is for the court to address and rule on the merits of that claim.[1] In an order entered on August 8, 2008, 571 F.Supp.2d 675 (E.D.N.C. 2008), the parties were directed to address the need for an evidentiary hearing to resolve the ineffective assistance of counsel claim. Both parties have filed briefs stating that an evidentiary hearing is not required, and the matter is now ripe for ruling.

The evidence presented by the State at trial tended to show that Mr. Radcliffe was shot shortly after 9 p.m. on February 11, 1994, while in the midst of trying to buy drugs. He was found slumped in the front of his pickup truck, and the evidence indicates he died from a single gunshot from a .45 caliber weapon. There is no physical evidence linking petitioner to the murder or the crime scene. The murder weapon was never recovered. One of the few pieces of physical evidence from the crime scene, a jacket found inside the victim's truck, does not belong to petitioner, but to a man named Marciana. The State's case at trial against petitioner rested on the testimony of two eyewitnesses: Charlene Johnson and Beatrice Stokes. Since the time of trial one of the witnesses, Charlene Johnson, has recanted her testimony in-court. There is information that the second eyewitness, Ms. Stokes, also recanted her testimony in writing before an investigator for the defense and two witnesses. However, the letter was not notarized and is not properly before the court.

At issue now before the court is petitioner's claim that he received ineffective assistance of counsel when his trial attorney, Cherry Stokes, failed to argue the correct hearsay exception and as a result, essential exculpatory evidence was excluded from trial.[2] Specifically, a witness, Tracy Highsmith, claimed that her boyfriend had admitted to her that he was responsible for killing the victim. Ms. Highsmith claimed that on the night of the murder, her boyfriend, Damien Smith, left their home shortly before 9:00 p.m. She said that when he returned home several hours later he told her that he had gone across town. He said had seen a white man sitting in a truck and the man wanted to "buy some." Damien said he robbed and shot the man, but did not know if he killed

---

1. The petition asserts three claims for relief: 1) ineffective assistance of counsel; 2) the state court erred in finding the recantation of a key witness was not credible; and, 3) the state court erred in finding that the testimony of Dearl Powell was not credible. Petitioner has conceded that his second and third claims do not provide independent grounds for habeas as relief. *See* Case No. 04–HC–886 (E.D.N.C.), Docket Entry # 22 at 4. Therefore, the only claim presently remaining before the court is petitioner's claim of ineffective assistance of counsel.

2. Cherry Stokes is no relation to witness Beatrice Stokes.

the man. The next day when Tracy and Damien learned the man had died, Damien said he had killed the man and he kept saying he would kill himself before going to jail for killing a white man. About 26 or 27 days later, Damien committed suicide. Trial Tr. at 340–343. Defense counsel argued for admission of Damien's hearsay statements under the dying declaration and state of mind exceptions to the rule against hearsay evidence.[3] The trial court sustained the State's objections to the admission of the hearsay under these exceptions and the defense was not allowed to offer Ms. Highsmith's exculpatory testimony to the jury. *Id.* at 357.

Petitioner argues that trial counsel was ineffective for failing to argue that Damien's hearsay statements should have been admitted under the statement against penal interest exception or to satisfy petitioner's due process rights.

A. *Facts at Trial*

As noted above, the State did not present any physical evidence linking petitioner to the murder, the victim, a murder weapon, or the crime scene. The State's case rested on the testimony of two eyewitnesses: Charlene Johnson and Beatrice Stokes. As was brought out at trial, both witnesses had credibility issues. Ms. Johnson, who was only fourteen at the time the murder occurred, was a troubled school dropout who hung out on the streets and sometimes dealt drugs. *Id.* at 39. She received $500 for the information she gave to police. *Id.* at 50, 67. Further, as was elicited during a post-conviction hearing, Charlene did not want to testify at trial. She had to be threatened with jail time and picked up by the police to secure her testimony at trial. Dec. 11, 1997 MAR Tr. at 9–12, 129–130. The second witness,

Ms. Stokes, admitted that she was a regular crack user at the time and was doing drugs when she witnessed the murder. Trial Tr. at 218, 226, 254. She also admitted to having several prior petty convictions. *Id.* at 238.

Charlene Johnson testified that after 9:00 p.m. on February 11, 1994, she was walking on 6th Street in Greenville, North Carolina, and saw petitioner and a man named Mark Joyner standing next to a pickup truck talking to a white man. She said the white man asked for a "twenty," but when he did not have enough money to pay, petitioner told him he had to have the money "straight up" and shoved the white man. Charlene said the white man cursed petitioner, and petitioner shot him. She said petitioner and Joyner lifted the white man into the pickup truck and drove the truck into a nearby field. Trial Tr. 40–45. Johnson did not talk about what she had witnessed to anyone until approximately two months after the murder. *Id.* at 72, 78.

Beatrice Stokes testified that on the night and time in question she was walking near 6th Street. *Id.* at 219. She said she saw Petitioner Sharpe, Mark Joyner, a man named Marciana, and two others standing near a truck. *Id.* at 220. She heard an argument, then a gunshot, and noticed petitioner was holding a gun. *Id.* at 221, 234. During her testimony she said she knew petitioner because she used to buy drugs from him. *Id.* at 217–18.

According to their testimony, although both women witnessed the crime and immediately went to Hannah's store after the shooting, they said they did not see one another on the night of the murder. *Id.* at 45–46, 76–77, 235, 241–42.

---

**3.** Counsel argued for admission only under these two exceptions. He never argued the statement should be admitted as a statement against penal interest.

The state also presented the testimony of Alonzo Vines. Mr. Vines testified that on the night of the murder he was at home and he heard a noise that sounded like a shot. As he was calling the police, he looked out the window and he said that he could see two or three people standing beside a truck. *Id.* at 93–95. He said he could not see faces, he could see the pants of the people. He said the truck was in his garden, and the driver side door of the truck was open. *Id.* at 94.

The victim was found by the police slumped over in the front of his truck in Mr. Vines' yard. The police also found a jacket inside the truck which they identified as belonging to a man known as Marciana.[4] *Id.* at 121–122. According to the police, when Marciana was questioned about the jacket he explained that he had dealt with the victim in the past and was trying to help the victim find some powder cocaine. Marciana told the police that he got out of the victim's truck to find the drugs and a marked police car drove by. The victim panicked and fled from the area with Marciana's coat still inside. Marciana said this had happened approximately two hours before the shooting. *Id.* at 124.

At trial, petitioner offered an alibi defense. His aunt, Patricia Ann Ward, and her neighbor, Patricia Hicks, testified that petitioner was with them from approximately 8:15 to 9:45, and 10:30 to 11:30 the night of the murder. Petitioner was first at Ms. Ward's house, where he ate, and then went next door to Ms. Hicks' house. He left Ms. Hicks' house at 9:45, but returned later with his girlfriend. The defense also put on two witnesses to attack the general reliability and credibility of Beatrice Stokes as a witness. Angela Sutton testified that Stokes could not be trust-

ed and was not honest. *Id.* at 331. Tracy Highsmith testified that Ms. Stokes could not be trusted and said she told a lot of lies. *Id.* at 337. Ms. Highsmith acknowledged she had been convicted of forgery in 1992 and that in the past she had been fired by the victim's mother-in-law. *Id.* at 335, 362–63.

The defense attempted to introduce Ms. Highsmith's testimony about incriminating statements her boyfriend, Damien Smith, made to her after Mr. Radcliffe was murdered. On voir dire, Ms. Highsmith testified about Damien's statements admitting his responsibility and that he said he would die before going to jail for killing a white man. *Id.* at 340–45. Defense counsel argued for admission of Damien's hearsay statements under only the dying declaration and state of mind exceptions to the rule against hearsay evidence. The trial court sustained the State's objections to the admission of the hearsay under these exceptions and the defense was not allowed to offer Ms. Highsmith's exculpatory testimony to the jury. *Id.* at 357.

### B.  *Factual Developments after Trial*

Within a month or two after trial, in 1995, Charlene Johnson recanted her testimony. She saw a woman who had been a paralegal on the defense team, Kay Lambert, at a restaurant. She approached Ms. Lambert and started talking to her. During one conversation she told Ms. Lambert that she had lied when she testified at trial. She said she had not been a witness to the murder. Dec. 11, 1997 MAR Tr. at 59. She explained that Detective Best had given her and her family gifts and money. *Id.* Employees of the police department confirmed that Charlene and her family

---

4.  Marciana's legal name is Wilbur Mercer. He is referred to as both Marciana and Wil-

bur Mercer in the record.

received some money and gifts during the period before trial. *Id.* at 138–42, 151–52. She has recanted in court under oath.

Later, in 2000, a witness, Dearl Powell, came forward for the first time. Consistent with the hearsay testimony of Damien Smith that was not admitted at trial, Mr. Powell claimed that on the night George Radcliffe was murdered, Powell had witnessed Damien Smith approach Mr. Radcliffe and demand money. He said he then heard a gunshot and saw Smith flee the scene. Sept. 11, 2002 MAR Tr. at 14, 17–24. Mr. Powell only identified himself as a witness shortly before an evidentiary hearing in this court in 2000. He explained that he had moved out of town shortly after the murder and had been living in Baltimore during petitioner's trial. *Id.* at 28–30. Mr. Powell's testimony was not known to the defense at the time of trial.

In addition to Charlene Johnson's recantation and Dearl Powell's new eyewitness account implicating Damien Smith, during the evidentiary hearings on these matters, additional information was elicited which, considered together, creates significant questions about prior accounts of the crime and petitioner's actual innocence. Dearl Powell testified that Beatrice Stokes was at the scene of the murders with Marciana. *Id.* at 18. He also testified that Beatrice Stokes and Marciana were very close, it was common to see them together, they got high together, and had an intimate relationship. *Id.* at 22–23. Charlene Johnson testified that Beatrice Stokes had lied when she said she did not receive money for her testimony at trial. Dec. 11, 1997 MAR Tr. at 59, 63. Marciana, whose jacket was found inside the victim's truck, acknowledged he was extremely close to Damien Smith, and present when Damien was removed from life support at the hospital after his suicide attempt. Sept. 11, 2002 MAR Tr. at 76–77. Dearl Powell

testified that Marciana had practically raised Damien. *Id.* at 21.

In conflict with testimony given by Beatrice Stokes and Charlene Johnson at trial and Dearl Powell at the evidentiary hearing, Marciana claimed he was not at the scene of the murder or a witness to the murder. Sept. 11, 2002 MAR Tr. at 71, 74, 76; Trial Tr. at 76, 234. In contrast to statements attributed to Marciana at trial, at the evidentiary hearing on the MAR held on September 11, 2002, Marciana claimed to have never met the victim before the day of the murder and admitted he left his coat in the car on purpose to scam the victim. He explained that his intent was to beat the victim out of his money by taking his money, telling him he was going to find drugs and that he would be back. He said he left his coat in the truck so that Mr. Radcliffe would believe he was returning, but he said he had no intention of returning. Sept. 11, 2002 MAR Tr. at 70.

## C. *Procedural History*

Petitioner was tried and convicted of non-capital first-degree murder at the July 24, 1995 Criminal Session of the Superior Court of Pitt County. He was sentenced to life imprisonment. On direct appeal the Supreme Court of North Carolina affirmed petitioner's conviction and sentence. *State v. Sharpe*, 344 N.C. 190, 473 S.E.2d 3 (1996). Petitioner filed a motion for appropriate relief ("MAR") raising his argument of ineffective assistance of counsel for counsel's failure to argue the correct hearsay exception and his argument that he was entitled to a new trial because Charlene Johnson had recanted her testimony. After an evidentiary hearing on the claim regarding the recantation of testimony, the MAR court denied the MAR. The Supreme Court of North Carolina denied Sharpe's petition for a writ of certio-

rari on August 19, 1999, 350 N.C. 848, 539 S.E.2d 647 (1999).

On December 22, 1999, petitioner filed a petition for writ of habeas corpus in this court. During an evidentiary hearing in October 2000, the defense presented the testimony of a new witness, Dearl Powell. Because Mr. Powell's testimony had never been considered by the state courts, this court remanded the matter. *See* March 12, 2001 Order in Case No. 5:99–HC–856–BO.

On November 30, 2001, petitioner filed a second MAR raising an argument of newly discovered evidence based on Dearl Powell's statements that he saw Damien Smith with the victim at the time of the murder. He argued that based on the new information from Mr. Powell, which corroborated the testimony Ms. Highsmith was not allowed to give at trial, he was entitled to a new trial. He also re-asserted his arguments about Charlene Johnson's recantation of her trial testimony and his argument that he received ineffective assistance of counsel when his trial attorney failed to argue the correct hearsay exception to have Ms. Highsmith's exculpatory testimony admitted before the jury. The MAR court denied part of the MAR in an order entered on October 21, 2002, and after an evidentiary hearing to consider Mr. Powell's testimony, entered an order denying the remaining claim regarding the newly discovered evidence. The Supreme Court of North Carolina denied Sharpe's petition for a writ of certiorari on November 18, 2003.

On November 17, 2004, petitioner re-asserted the issues in a petition for writ of habeas corpus filed with this court. The petitioner raised three claims: 1) ineffective assistance of counsel because his attorney failed to argue the proper basis to have Ms. Highsmith's exculpatory testimony presented at trial; 2) the state court erred by finding that the recantation of a key witness was not credible; and, 3) that the state court erred by finding that the testimony of Dearl Powell was not credible.

In an order entered on March 29, 2006, this court dismissed the habeas petition as second or successive. Sharpe appealed the dismissal, and the Fourth Circuit remanded the matter finding that this court had not issued a decision on the first habeas petition, but had remanded all issues to state court. *See Sharpe v. Bell*, No. 06–6825, —— Fed.Appx. ——, 2007 WL 1180306, 2007 U.S.App. Lexis 9165 (4th Cir. April 20, 2007). The case was re-opened in this court, and the parties were allowed to file supplemental briefs on respondent's motion for summary judgment. Petitioner has conceded that his second and third claims asserted in the petition do not provide independent grounds for habeas relief, but argues that they demonstrate grounds to overcome any procedural bars to his claim of ineffective assistance of counsel. *See* Docket Entry # 22 at 4. A hearing was held before the court on June 18, 2008. In an order entered on August 8, 2008, the court concluded that the petition was not time-barred and was properly before the court. *See* 571 F.Supp.2d at 678–79. The court further held that petitioner had demonstrated grounds to overcome any procedural bar to this court considering his claim of ineffective assistance of counsel. *Id.*

D. *Discussion*

Petitioner argues that he received ineffective assistance of counsel at trial when his attorney failed to correctly argue for admission of the hearsay testimony and as a result, essential exculpatory evidence was excluded from trial. To establish ineffective assistance of counsel, a petitioner must show that counsel's representation

"fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court must judge the reasonableness of counsel's performance based upon the specific facts of the case, viewed as of the time of counsel's conduct. *Id.* at 690, 104 S.Ct. 2052. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). The court's review of petitioner's claim is governed by the standards of 28 U.S.C. § 2254.

██ Petitioner argues that he was clearly prejudiced by counsel's error. He notes that the State did not produce any physical evidence linking him to the murder and that there are inconsistencies in the trial testimony of Charlene Johnson and Beatrice Stokes who both already had credibility issues. Charlene Johnson was a fourteen year old school dropout who sometimes sold drugs. She received $500 for her information and testimony about the crime and she and her family received other money gifts from the police in the time leading up to trial. Beatrice Stokes was a regular crack user who admitted using drugs the night of the crime. She was regularly seen with Marciana, who stole money from the victim on the night of the crime and whose jacket was found by the police inside the victim's truck. Petitioner argues that under these circumstances, there was a reasonable probability of a different outcome at trial if counsel had properly argued to have Damien Smith's statements admitting responsibility placed before the jury.

In ruling on the second MAR, the MAR court alternatively held that petitioner's claim of ineffective assistance of counsel would fail on the merits. The court found that counsel was not deficient for failing to argue that the hearsay should be admitted as a statement against interest because the hearsay would not have come in under the exception. The court reasoned:

> This is because the hearsay did not qualify to be admitted under that exception or any other. Specifically, the hearsay matched only the first prerequisite component of a declaration against interest; that is the declarant was unavailable because of his death. Other components fail. Without having to decide whether it is possible to determine what a reasonable man in the unfortunate Mr. Damien Smith's position would have said, this Court finds as a matter of law, that in confessing, if he did, at home, only to his live-in girlfriend to killing and robbing a white man, Smith did not subject himself to criminal liability, and furthermore, that corroborating circumstances certainly did not clearly indicate the trustworthiness of the statement.

October 21, 2002 MAR Order at 14. The court further reasoned that because the evidence would not have come in, petitioner was not prejudiced by his attorney's failure to make the argument. *Id.*

Petitioner argues that his attorney rendered ineffective assistance of counsel by failing to properly argue for the admission of Damien Smith's hearsay statements under the correct North Carolina hearsay exception and by failing to argue that the it would be a violation of petitioner's due process rights to exclude the exculpatory testimony at trial.

A defendant has a due process right to present evidence in his defense. However, the right is not unrestricted. He "must comply with established rules of procedure and evidence designed to assure both fairness and reliability" in the proceedings. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A defendant's right to due process rights is violated if he is precluded from offering evidence of a statement against interest where the circumstances demonstrates sufficient assurance of trustworthiness. *Id.*

In accordance with state law, Rule 804(b)(3) of the North Carolina Rules of Evidence provides that the following type of hearsay statement is admissible if the declarant is unavailable as a witness:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The admission of evidence under Rule 804(b)(3) is governed by a two-prong analysis: 1) the statement must be against the declarant's penal interest, and 2) the trial judge must find that corroborating circumstances insure the trustworthiness of the statement. *See State v. Dewberry*, 166 N.C.App. 177, 180–81, 600 S.E.2d 866, 869 (N.C.App.2004). The determination of the trustworthiness or reliability of the statement is left to the sound discretion of the trial judge. *State v. Wardrett*, 145 N.C.App. 409, 415, 551 S.E.2d 214, 218 (N.C.App.2001) (citing *State v. Haywood*, 295 N.C. 709, 728, 249 S.E.2d 429, 441 (1978)).

The court finds if the evidence has been properly developed at the time of trial, counsel could have persuasively argued that the statement was against penal interest and sufficiently credible to place before the jury for consideration. Counsel could have also persuasively argued that the statements were sufficiently trustworthy and that due process required admission so that the jury could weigh Damien's admission against the eyewitness accounts, the only evidence presented of petitioner's guilt.

The MAR court reasoned that the trial court would have rejected admission of the evidence as a statement against penal interest because Damien made the statement to his live-in girlfriend. However, Damien's repeated inculpatory statements to Ms. Highsmith, especially in light of the reward for information, created circumstances under which he was putting himself in legal jeopardy. There is no established North Carolina law excluding a statement as being considered a statement against penal interest solely because it is made to a girlfriend or other confidant or in the confines of a private setting.

Further, the MAR court relied on the fact that Damien purportedly admitted to robbing the victim and the State contended the victim was not robbed at the time of the shooting. However, there is no real evidence to indicate whether or not the victim was robbed. The MAR court presumably based its opinion that the victim was not robbed on the fact that the police found $53 in the victim's wallet on the floor of the truck. However, Wilbur Mercer or Marciana, a witness for the State at the evidentiary hearing on the MAR held on September 11, 2002, testified that he stole money from the victim just a couple of hours before the murder in the same area

where the victim was killed. Therefore, the mere presence of additional money in the victim's wallet does not establish that the victim did not have other money stolen from him at the time he was shot.[5]

Ms. Highsmith gave a fairly detailed account of the circumstances the night of the murder surrounding Damien's confession to shooting the victim. Damien's admission came soon after the shooting and Damien made the statements not just on the night of the murder, but reaffirmed his responsibility for the shooting after they heard the next day that the victim had died and again in the weeks prior to Damien's death. Damien's account to Ms. Highsmith was consistent with the general location, time, and date of Mr. Radcliffe's murder as well as the fact that it involved a white man trying to buy drugs.

There is no evidence that she tried to receive any reward money or other benefits for her testimony and she had no apparent motive to implicate her ex-boyfriend. While Ms. Highsmith did not come forward until the time of trial, when questioned at the hearing in federal court in 2000 she explained that it was hearing news accounts on television just prior to trial that lead to conversations with her sister which eventually resulted in contact with petitioner's trial attorney. Likewise, if she had been questioned at the time of trial with the intent of offering the evidence as a statement against penal interest or based on due process, Ms. Highsmith could have been questioned with an eye to adequately explaining her delay and with an aim of establishing the trustworthiness or reliability of her account. Finally, while Damien Smith had a history

of depression and suicide attempts, it is telling that just weeks after the murder he successfully committed suicide after repeatedly telling Ms. Highsmith that he would kill himself before going to jail for killing a white man.

Petitioner has also established he was prejudiced by counsel's deficient representation. The case against petitioner was weak. Petitioner is not linked by any physical evidence to the murder, the murder weapon, the victim, or the crime scene. The jacket found inside the truck points to the victim's recent contact with another person, Marciana, a man who had a close relationship with Damien Smith and witness Beatrice Stokes. The State's interpretation of the crime presented by its primary witness at trial, that petitioner shot Mr. Radcliffe because he did not have enough money, is not consistent with the $53 found inside the victim's wallet. The case against petitioner was based solely on the testimony of two eyewitnesses who had significant credibility issues. In fact, the case began to unravel almost immediately after trial when the police no longer showered attention on, or exerted influence over, the fourteen year-old eyewitness. Given the lack of any physical evidence linking petitioner to the crime and the questionable reliability of the witnesses, had the jury been confronted with Damien's inculpatory statements offering an alternative explanation of the crime, there is a reasonable probability the jury would not have convicted petitioner.

Accordingly, Petitioner Sharpe has established he is in custody in violation of the Constitution or laws of the United

---

**5.** The court also notes that the money found in the victim's wallet tends to contradict Charlene Johnson's trial testimony and lends credence to her recantation and admission that she did not witness the murder. At trial she alone gave testimony about what the

perpetrator and victim were arguing about, and claimed the victim was shot because he did not have enough money to pay for $20 worth of drugs. The State's evidence that the victim had $53 in his wallet undermines the reliability of this account.

States and the petition for writ of habeas corpus is GRANTED. Sharpe shall be unconditionally released from custody on the state court's judgment entered at the July 24, 1995, Criminal Session of Pitt County Superior Court unless, within 180 days, the State of North Carolina initiates new trial proceedings against Sharpe.

SO ORDERED, this 7th day of January 2009.