**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MONTOYAE DONTAE SHARPE,

    *Petitioner-Appellee,*

v.

MICHAEL T. W. BELL,

    *Respondent-Appellant.*

No. 09-6206

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:04-hc-00886-BO)

Argued: December 4, 2009

Decided: January 29, 2010

Before WILKINSON and KING, Circuit Judges, and
Henry E. HUDSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Hudson joined.

---

## COUNSEL

**ARGUED**: Clarence Joe DelForge, III, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. William Gregory Duke, Greenville, North Caro-

lina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina, for Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

Montoyae Dontae Sharpe was convicted of first degree murder in North Carolina Superior Court and sentenced to life in prison. After exhausting state post-conviction remedies, Sharpe petitioned for habeas corpus in federal court, claiming that his conviction was unconstitutional because it resulted from ineffective assistance of counsel. Although he had procedurally defaulted on this claim, the district court held that Sharpe had come forward with new evidence of "actual innocence" sufficient to excuse his default. The district court then ruled in Sharpe's favor on the merits of his constitutional claim. Yet in reaching its conclusions, the district court ignored the several state post-conviction proceedings which had determined that the evidence Sharpe presented was not credible and that his constitutional claim was without merit.

Such a *de novo* do-over was impermissible under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Sharpe would have us substitute our own judgment for the state court's credibility determinations, disregard the fact that the state courts soundly assessed each of his contentions, and unfairly hindsight the performance of his own trial counsel. Such an approach undermines the principles of comity and federalism that the Supreme Court and Congress have set forth in the context of federal habeas review. We therefore reverse and remand with directions to dismiss the petition.

I.

Dontae Sharpe was charged with killing a man named George Radcliffe, who was shot to death on the night of Feb-

ruary 11, 1994, in downtown Greenville, North Carolina. Radcliffe's body was found inside his pickup truck on a grassy lot, just off a downtown street. Inside the truck, police officers found Radcliffe's wallet, which contained fifty-three dollars, and a coat later identified as belonging to one Wilbur Mercer.

At trial, the state offered the testimony of two purported eyewitnesses to the killing. Beatrice Stokes, twenty-seven years old, and Charlene Johnson, fifteen years old, both testified that Sharpe sold drugs with a man named Mark Joyner and was a leading drug dealer in the neighborhood where Radcliffe's body was found. Both testified that on the night of the murder, they saw Sharpe, Joyner, and Radcliffe standing in the street next to Radcliffe's pickup truck, that an argument broke out, and that Sharpe shot Radcliffe. Both stated that Wilbur Mercer was also at the scene, and Stokes noted the presence of several others.

Stokes testified that she immediately fled and called the police when the shot went off. Johnson testified that she watched Sharpe and Joyner load Radcliffe's body into the truck and drive it into the lot where it was found. Johnson admitted that she had received a reward for coming forward. Stokes testified that she had not received a reward but admitted that she was probably using drugs at the time.

A third eyewitness, Alonzo Vines, lived in a house adjacent to the lot where Radcliffe's truck was found. He testified that he was in his house on the night of the murder when he heard a loud noise, looked out his window, and saw that a pickup truck had been driven into the lot. He stated that he saw the truck's door was open and that two or three people were standing next to it. He could not identify them, however, because his view was blocked by dust on his windows. Seven other witnesses testified for the state. The state's medical examiner testified as to the trajectory of the bullet and opined that Radcliffe could have remained conscious after the shoot-

ing for no more than 10 seconds. Police officers investigating the murder testified that local residents appeared to be afraid to get involved.

In his defense, Sharpe offered the testimony of his aunt and her neighbor, who offered partial alibis, and of two witnesses who testified that Stokes was untrustworthy. Sharpe also attempted to introduce further testimony from one of these witnesses, a woman named Tracy Highsmith. On voir dire, Highsmith stated that her boyfriend, Damien Smith, had come home on the night of the murder and confessed to shooting a man, presumed to be Radcliffe, whom he had attempted to rob. According to Highsmith, Smith repeated comments to this effect several times over the next three weeks. Smith committed suicide twenty-seven days after the murder, and while Highsmith asserted that he had become increasingly agitated after Radcliffe was killed, she also admitted that he had repeatedly threatened suicide before Radcliffe's death. Although Sharpe's attorney argued that Highsmith's testimony should be admitted under the dying declaration and state of mind exceptions to the bar on hearsay evidence, the court held that the testimony was inadmissible. A jury found Sharpe guilty on July 24, 1995, and the North Carolina Supreme Court sustained his conviction on appeal. *State v. Sharpe*, 473 S.E.2d 3 (N.C. 1996).

On the day Sharpe was first arrested for the murder, Charlene Johnson had been beaten and stabbed by a group of women for being a "snitch." Sharpe's mother and aunt had followed behind the women as they set out for Johnson's home and rescued Johnson from the attack. In the course of taking her to the emergency room, they told her, in Johnson's words, that the "word on the street" was that Johnson was "the one that said something about Dontae murdering Mr. Radcliffe." For safety reasons, Johnson went to live outside of Greenville, but her mother could not come with her, and she returned after a few weeks. Johnson came to form a relationship with Sharpe's family, and eventually with Sharpe him-

self, visiting him in prison at least twice. Not long after his conviction, Johnson recanted her testimony.

In February 1997, Sharpe filed a motion for appropriate relief ("MAR") in North Carolina Superior Court, alleging that the recantation entitled him to a new trial and raising, for the first time, a claim of ineffective assistance of counsel. The MAR court held an evidentiary hearing and determined that Johnson's recantation was not credible. It also held that the ineffective assistance of counsel claim had been defaulted.

Sharpe then filed for habeas corpus in federal court, and the district court scheduled an evidentiary hearing on his claims. Just prior to the hearing, a man named Dearl Powell came forward, claiming to have witnessed the shooting and indentifying Smith as Radcliffe's killer. In Powell's account, Radcliffe was in the driver seat of the truck and Wilbur Mercer was in the passenger seat when Smith shot Radcliffe through the driver side window. According to Powell, after being shot, Radcliffe drove the truck off. Powell began to testify at the habeas hearing, but the district court cut him off before he could be cross-examined and ordered that his evidence be presented first in North Carolina court.

Sharpe filed another MAR in November 2001, seeking a new trial under North Carolina law on the basis of newly discovered evidence of actual innocence and renewing his ineffective assistance of counsel claim. A second evidentiary hearing was held before the same judge who had considered Sharpe's earlier MAR. After listening to Powell and considering the entire evidentiary record, the court concluded that his testimony was not credible and denied Sharpe's actual innocence claim. In addition, the court held that Sharpe's ineffective assistance of counsel claim was not only defaulted, as it had done previously, but also that it would fail on the merits.

Sharpe then returned to federal court. Without holding an evidentiary hearing, the district court concluded that Sharpe

had sufficiently made out a claim of "actual innocence" under *Schlup v. Delo*, 513 U.S. 298 (1995), to justify setting aside his procedural default under North Carolina law. *Sharpe v. Bell*, 571 F.Supp.2d 675, 681 (E.D.N.C. 2009). It also rejected the state's statute-of-limitations defense. *Id.* at 680. The district court then concluded that the failure of Sharpe's counsel to argue for the admission of Highsmith's testimony under the hearsay exceptions identified in Sharpe's habeas petition violated the Sixth Amendment. *Sharpe v. Bell*, 595 F.Supp.2d 636, 644-45 (E.D.N.C. 2009). This appeal followed.

## II.

## A.

We begin with the district court's conclusion that Sharpe's procedural default in raising his claim of ineffective assistance of counsel should be excused.[1] In general, "a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." *Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000); *see also Wainwright v. Sykes*, 433 U.S. 72, 87-91 (1977). The MAR court held that Sharpe had procedurally defaulted under N.C.G.S. § 15A–1419(a)(3), a statute we have repeatedly held to be both adequate and independent. *Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008) (citations omitted). A federal habeas court "does not have license to question a state court's finding of procedural default" or to question "whether the state court properly applied its own law." *Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995) (citations omitted). Nor is a procedural default waived when a state court reaches the merits of a federal claim as an alternative

---

[1]In light of the district court's conclusion that the timeliness of Sharpe's federal habeas petition has been established as law of the case, we decline the state's invitation to consider anew whether Sharpe's second petition was time-barred under AEDPA. *See* 28 U.S.C. § 2244(d)(1).

basis for dismissal. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Ashe v. Styles*, 39 F.3d 80, 86 (4th Cir. 1994).

Although the doctrine of procedural default limits federal habeas review of state convictions, it does not provide an absolute bar. In order to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," the Supreme Court has recognized an exception for situations in which a petitioner's incarceration represents a "fundamental miscarriage of justice." *Schlup*, 513 U.S. at 324. This exception excuses a procedural default where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). If a petitioner presents "new reliable evidence" supporting a claim of actual innocence, the habeas court must determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327-28. This assessment is based on a review of "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted) (citing *Schlup*, 513 U.S. at 327-28).

### B.

Whether and to what extent AEDPA applies to *Schlup* claims is the threshold question. One of the most significant changes wrought by AEDPA was to provide that, with certain limited exceptions, a petition for federal habeas must be denied if it is founded on a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). With respect to a *Schlup* claim of actual innocence, however, we do not believe that this provision applies. State courts have no occasion to adjudicate a *Schlup* claim as such and "the MAR court's primary holding—that the [ineffective assistance of

counsel] claim was procedurally barred—was not an 'adjudication on the merits' under 28 U.S.C. § 2254(d)." *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009); *but see Cooper v. Brown*, 565 F.3d 581, 638 (9th Cir. 2009) (Rymer, J., concurring in denial of rehearing en banc).

But while a state court does not adjudicate a *Schlup* claim, it may well decide matters relevant to one, quite possibly in the course of deciding highly similar issues of state or federal law. In addition to Section 2254(d), AEDPA also provides that in a habeas proceeding challenging a state conviction, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* While Section 2254(d) thus has no application in the context of a *Schlup* claim because it pertains only to a "claim that was adjudicated" in state court, Section 2254(e)(1) does come into play because it refers to the "determination of a factual issue"— that is, to a state court's findings of fact, rather than its conclusions of federal law. *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); *see also Goldblum v. Klem*, 510 F.3d 204, 212, 221 n.13 (3d Cir. 2007) (applying presumption of correctness under Section 2254(e)(1) in resolving *Schlup* claim). This conclusion is generally consistent with the pre-AEDPA standard of review for factual matters, which recognized the need to defer to state court fact-finding as a matter of comity and federalism. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 546-47, (1981).

AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court. *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007); *Valdez v. Cockrell*, 274 F.3d, 941, 951 & n. 17 (5th Cir. 2001); *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000). Nonetheless, the character of the process upon which the state court based its conclusion may have some bearing on whether a petitioner's showing amounts to "clear and con-

vincing" evidence that the state court erred. *Mendiola*, 224 F.3d at 592. Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part. This is especially so when the court resolved issues like witness credibility, which are "factual determinations" for purposes of Section 2254(e)(1). *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003). "[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." *Cagle v. Branker*, 520 F.3d 320, 324-25 (4th Cir. 2008) (citing *Lonberger*, 459 U.S. at 434); *see also Miller v. Fenton*, 474 U.S. 104, 114 (1985).

This all makes sense in the general scheme of things. AEDPA in general and Section 2254(e) in particular were designed "to further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). Section 2254(e)(1) plainly seeks to conserve judicial resources and reflects Congress's view that there is no reason for a do-over in federal court when it comes to facts already resolved by state tribunals. That section also reflects Congress's respect for principles of federalism, recognizing that a decision to set aside state court factual findings intrudes on the state's interest in administering its criminal law. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The deference Section 2254(e)(1) requires has particular salience when a state court's determinations closely track the legal issues before the federal habeas court. Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, Section 2254(e)(1) requires that the state court's findings of fact not be casually cast aside. *See Miller*, 474 U.S. at 113 (citation omitted). Indeed, the cavalier treatment of such findings in federal *Schlup* proceedings would contravene the course of federal-state relations set by the Congress and the Supreme Court with great consistency over a very considerable period of time.

## C.

In considering Sharpe's petition, the district court found that the combination of Sharpe's two alibi witnesses, Johnson's recantation, an absence of physical evidence linking Sharpe to the crime, and the testimony of Highsmith and Powell amounted to "a strong showing" under *Schlup*, and that Sharpe's procedural default on his ineffective assistance of counsel claim should therefore be excused. *Sharpe*, 571 F.Supp.2d at 681. Yet the MAR court considered all this evidence and more, and specifically found that Powell's testimony, Highsmith's hearsay testimony, and Johnson's recantation were not credible and that Johnson's original testimony at trial was. Unless Sharpe could present clear and convincing evidence that those findings were unwarranted, *see* 28 U.S.C. § 2254(e)(1), the district court was obliged to respect them in ruling on Sharpe's *Schlup* claim. The district court, however, did not so much as acknowledge the MAR court's efforts, other than to note in passing that the motion based on Powell's testimony had been rejected. *Sharpe*, 571 F.Supp.2d at 678. Nowhere in its discussion of Sharpe's actual innocence claim did it so much as mention the MAR court's having probed and assessed the evidence that was the basis for the claim. *See id.* at 680-81.

The court's failure to do so was error. At the outset, we note that the MAR court provided a much more substantial fact-finding process than the district court and was far better positioned to decide the sorts of factual matters that the district court opted to decide for itself. The MAR court heard from nineteen witnesses altogether. The transcripts of the MAR evidentiary hearings total more than three hundred pages. Lest there be any doubt, the MAR court repeatedly alluded to its impressions of the demeanor and comportment of various witnesses and made it clear that its judgments were informed by those observations. The district court, by contrast, held only a truncated evidentiary hearing and made no findings of fact or assessments of credibility. Where, for

example, the MAR court concluded that Johnson's recantation was untrustworthy after hearing from a dozen different witnesses on the matter, the district court credited Johnson's recantation without hearing even from Johnson, let alone anyone else who could speak to the veracity of her statements.

We also note that the MAR court was tasked with an inquiry similar to that required of the district court. It considered Sharpe's claim for a new trial under North Carolina law based on new evidence of actual innocence. The claim was rejected after considering Powell's testimony in light of a holistic examination of the entire record, including both Johnson's recantation and Highsmith's story of Smith's confession. The court's decision was based on a preponderance of the evidence standard. *See State v. Beaver*, 229 S.E.2d 179, 183 (N.C. 1976). The only appreciable respect in which the state court's legal analysis differed from *Schlup* was that the court itself evaluated the evidence, rather than attempting to predict the reaction of hypothetical jurors to that evidence. *See Schlup*, 513 U.S. at 329 (actual innocence is based upon "a probabilistic determination" that "no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt."). Given the similarity of the state proceedings to petitioner's habeas claims under *Schlup*, the state court's factual determinations should have exerted a heavy pull on the habeas court's adjudication.

### D.

Turning to the reasoning of the MAR court's opinion, we note that the explanations it provided were commendably thorough. The district court's explanation of its *Schlup* ruling consisted of five sentences. *See Sharpe*, 571 F.Supp.2d at 681. By contrast, the MAR court's analysis on the single issue of Powell's credibility took up eleven pages. And in terms of substance, we find the MAR court's conclusions to be plainly reasonable and certainly uncontradicted by clear and convincing evidence.

In determining that Dearl Powell's testimony "entirely lacks credibility," the MAR court exhaustively catalogued the problems with it. We touch only a few of those problems here. Powell's account did not square with the medical examiner's testimony as to the bullet's trajectory. It was also inconsistent with the fact that Wilbur Mercer and Damien Smith were like father and son and Mercer had been at Smith's bedside when life support was turned off, yet in Powell's account, Mercer was sitting next to Radcliffe in the truck when Smith fired the fatal shot. No explanation was provided for why Smith would "endanger someone so close to him."

Powell's claim that Radcliffe drove the car into Vines's lot was inconsistent with the medical examiner's opinion that Radcliffe would have lost all consciousness within seconds of being shot. Powell's claim that Smith had robbed Radcliffe was inconsistent with the fact that money was found in Radcliffe's wallet. Powell's account, in which Joyner "plays no part," was inconsistent with the fact that Joyner pled guilty as an accessory. Powell denied that the shooting had taken place in Sharpe drug-selling territory, contradicting the testimony of multiple witnesses.

The MAR court also noted reasons to doubt Powell's motive in testifying and his general trustworthiness. Powell claimed that he was moved to come forward because he did not want to see an innocent man go to jail, yet somehow Powell did not come forward for six years and thereby "allowed not just one, but two men, the Defendant and Mark Joyner, to serve prison sentences for a crime they did not commit." The court noted that Powell adopted a "belligerent[ ]" attitude on the stand inconsistent with his claim that it was his conscience that prompted him to come forward. The court expressed skepticism at Powell's suggestion that it was simply a "'coincidence'" he came forward just in time for Sharpe's federal habeas hearing, and it noted that Powell sat with Sharpe's family and supporters throughout the MAR proceedings. It

also took account of Powell's own criminal record and the fact that he too was a drug dealer.

In contrast, the MAR court found that Johnson's and Stokes's original trial testimony was believable. That testimony was consistent with the rest of the evidentiary record in every way that Powell's testimony was not. Furthermore, Johnson and Stokes "independently and separately" came forward soon after Radcliffe's shooting and gave accounts that were consistent with one another. Both Stokes and Johnson were subjected to rigorous cross-examination, but neither wavered in her testimony. The truthfulness of Johnson's original testimony was also corroborated by numerous witnesses who testified that Johnson consistently gave the same account before trial, even though she had been "severely" beaten for having identified Sharpe to the police. Both Stokes and Johnson "had to have known that it was very dangerous to spread a lie, if it was one, about Dontae Sharpe."

The MAR court also found reasons to question the credibility of Johnson's recantation and Highsmith's hearsay testimony. Johnson was "young and lonely" and only recanted after having befriended Sharpe and his family. Highsmith's story was particularly dubious in light of the fact that, although the police had originally suspected her of murdering Smith, she somehow never told them what would have been an exculpatory story of Smith's confession and his subsequent emotional turmoil and suicide. And despite the reward that was being offered for information about the killing, Highsmith did not tell anyone her story until the eve of trial. The court also took account of Highsmith's criminal record. Furthermore, even if Highsmith was telling the truth, the court noted reasons to doubt the veracity of Smith's supposed confession. Smith was a drug user and was emotionally disturbed, as evidenced by his suicide. Any confession would also need to be discounted as hearsay, uttered entirely in private, rather than offered under oath in court.

Finally, the MAR court noted that investigators could not find witnesses and that "[p]eople behaved as though they were afraid to speak." That finding was consistent with the killer being a live drug dealer, capable of striking fear into the heart of the community, rather than a dead man, who could strike fear into no one. And the MAR court recognized that Highsmith's story may well have formed a "nucleus" around which to build a story implicating Smith, who by then was "conveniently dead."

Based on all of these considerations, the state court concluded that Sharpe had not established by a preponderance of the evidence that Johnson's and Stokes's trial testimony had been called into any real doubt. That conclusion and the subsidiary determinations on which it rested should have been taken into account in the district court's analysis of the requirements set out in *Schlup*. Even without the deference that AEDPA mandates, there is little basis for concluding that Sharpe had successfully made out his *Schlup* claim. But when the requirements of Section 2254(e)(1) are factored in, the appropriate course for the district court was apparent.

### III.

### A.

Sharpe's flawed *Schlup* claim is not the only problem with his habeas petition. Even if the procedural default could somehow be excused, Sharpe's ineffective assistance argument has its own deficiencies. Sharpe's ineffectiveness claim centers on the proposed testimony of Tracy Highsmith, who, as noted, was prepared to tell the jury that her boyfriend Damien Smith had confessed to the murder prior to his suicide three weeks later. Sharpe argues that his attorney's failure to argue for the admission of Highsmith's testimony at trial either as a statement against penal interest under North Carolina evidentiary law or under the due process principle

established in *Chambers v. Mississippi*, 410 U.S. 284 (1973), denied him the right to effective assistance of counsel.

To make out such a claim, Sharpe must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first prong of the *Strickland* test, Sharpe "must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688. Judicial scrutiny of counsel's performance "must be highly deferential," and a reviewing court must avoid the biases of hindsight. *Id.* at 689. Under the second prong of the test, Sharpe must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

It should be obvious that the failure of Sharpe's gateway actual innocence claim under *Schlup* makes it less likely that Sharpe's ineffective assistance of counsel claim would succeed on the merits. First, unlike the *Schlup* claim, Sharpe's ineffective assistance of counsel claim was rejected in the state court proceedings, and the state courts' disposition of that claim is entitled to the full measure of AEDPA deference. Second, the range of materials favorable to Sharpe's case that are relevant to the ineffective assistance of counsel claim is more restricted than those relevant to his actual innocence claim. Newly discovered post-trial evidence -– Powell's testimony and Charlene Johnson's recantation—would have no bearing on Sharpe's particular Sixth Amendment claim.

As discussed, Section 2254(d) ordinarily bars federal habeas relief for "any claim that was adjudicated on the merits in State court proceedings," and the MAR court rejected Sharpe's ineffective assistance of counsel claim on substantive, as well as procedural, grounds. Despite Sharpe's contention to the contrary, a state court's alternative holding on the merits of a constitutional claim qualifies for deference under

Section 2254(d).**²** *Stephens*, 570 F.3d at 208; *accord Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008); *see also Harris*, 489 U.S. at 264 n.10. In order to win relief, Sharpe would therefore need to show that the MAR court's adjudication on the merits either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Furthermore, under Section 2254(e)(1), factual findings must be taken as correct unless there is clear and convincing evidence to the contrary. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

## B.

In this case, the MAR court found that Sharpe failed both prongs of *Strickland* because Highsmith's testimony would not have been admissible under the hearsay exceptions Sharpe claims his attorney should have invoked. The court reasoned that since the testimony would not have been admissible, Sharpe's counsel was not ineffective in failing to argue for its introduction.

Certainly, the MAR court did not reach a result "contrary to" *Strickland*, since it relied on the case and correctly articulated its holding. Nor did it unreasonably apply *Strickland* in concluding that, since Highsmith's testimony was inadmissible, it was neither objectively unreasonable nor prejudicial to Sharpe's case to refrain from seeking its admission. "Counsel

---

**²**Sharpe also asserts that the MAR court rejected his ineffective assistance of counsel claim "without any substantive analysis," but that allegation is plainly untrue. The MAR court's discussion of Sharpe's claim was extensive, and Sharpe himself takes issue with various points in the court's reasoning. At any rate, § 2254(d) applies to a state court's rejection of a constitutional claim even where the court "did not articulate the rationale underlying its rejection" of the claim. *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (en banc).

is not required to engage in the filing of futile motions." *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) (citation omitted). Therefore, the only question is whether the MAR court's conclusion that the testimony would not have been admissible was unreasonable.

The North Carolina Rules of Evidence allow a person's statement that would otherwise be excluded as hearsay to be admitted in a criminal trial if, *inter alia*, the statement "so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true" and if "corroborating circumstances clearly indicate the trustworthiness of the statement." N.C.G.S. § 8C-1, Rule 804(b)(3). The MAR court concluded that a confession by Smith made at home and only to his live-in girlfriend was not one that would tend to subject Smith to criminal liability. It also held that the circumstances surrounding the making of the statement indicated that the statement was *not* trustworthy.

The district court cast aside this conclusion, arguing that there was no North Carolina authority for the proposition that a statement made only to a live-in girlfriend could not constitute a statement against penal interest. *See Sharpe*, 595 F.Supp.2d at 643. It is beyond the mandate of federal habeas courts, however, to correct the interpretation by state courts of a state's own laws. *Cagle*, 520 F.3d at 324 (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). To do so only on the basis of an absence of authority to support the state court's conclusion, rather than the presence of contrary authority, is particularly misguided.

Thus, Sharpe's entire Sixth Amendment claim, and the correctness of the result reached by the district court, hinges on establishing that it was unreasonable for the MAR court to conclude that the due process interpretation given in *Chambers*, 410 U.S. 284, would not have supported the introduction of Highsmith's testimony. *Chambers* required that a defen-

dant be allowed to introduce evidence that a third party had confessed to the crime of which the defendant stood accused. *Id.* at 302. In *Chambers*, however, the third party confessed in writing, orally confessed to three different people, and was available to testify at trial. *Id.* at 297. The MAR court noted that the deceased Smith's alleged oral confession only to his girlfriend differed in every respect from the situation in *Chambers*, and that, according to the Supreme Court, *Chambers* "specifically confined its holding to the 'facts and circumstances' presented in that case." *U.S. v. Scheffer*, 523 U.S. 303, 316 (1998) (plurality) (quoting *Chambers*, 410 U.S. at 303).

In addition, the result in *Chambers* was predicated on the existence of "persuasive assurances of trustworthiness," *Chambers*, 410 U.S. at 302, and the MAR court provided numerous reasons to consider the Highsmith hearsay untrustworthy. These included Highsmith's criminal record, the fact that she never came forward with her testimony until the eve of trial, the fact that Smith was obviously emotionally disturbed, the fact that Smith allegedly claimed to have robbed the victim when Radcliffe's wallet was found in the truck with fifty three dollars in it, and the fact that no evidence in the record at the time of trial corroborated Highsmith's testimony.

As it had done with the MAR court's North Carolina Rules of Evidence ruling, the district court rejected the MAR court's conclusion on *Chambers*. It never once considered the differences noted by the MAR court between the Highsmith hearsay and the facts of *Chambers*. Instead, it offered a smattering of reasons to credit Highsmith's testimony, including Johnson's post-trial recantation. *Sharpe*, 595 F.Supp.2d at 644. And it took issue with the MAR court's reasoning that the money in Radcliffe's wallet undermined Highsmith's story, since Radcliffe might have been robbed without losing all of his cash. *Id.* at 644-45. The court ignored all the other indications of untrustworthiness cited by the MAR court.

Furthermore, in assessing Sharpe's *Strickland* claim, the district court also erred in taking into account Johnson's recantation. Johnson's recantation occurred after Sharpe's conviction, and it cannot be used to suggest that it was more likely that the Highsmith hearsay would have been admitted, since neither Sharpe's counsel nor the trial judge could possibly have been aware of it. Nor can Johnson's recantation be used to suggest that Sharpe might not have been convicted if Highsmith's testimony had been introduced, since the jury would not have known of it either. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed *as of the time* of counsel's conduct." *Strickland*, 466 U.S. at 690 (emphasis added). The North Carolina courts were certainly reasonable in determining that the difficulties in Sharpe's case lay not in any deficiency of counsel but in the understandable reluctance of the state system to buy a belated and contrived attempt to pin Radcliffe's murder on someone who was all-too-conveniently deceased.

## IV.

There is little left to say as to Sharpe's petition except that it overlooks the state courts' efforts at every turn and in every way. Quite aside from the damage inflicted on AEDPA and dual sovereignty, a ruling in Sharpe's favor would fail to recognize the dedicated manner in which the state court system went about its work. The encouragement of capable and conscientious judging on the part of states is what comity is all about. The state courts did their job well here and this case is accordingly remanded with directions that the federal habeas petition be dismissed.

*REVERSED AND REMANDED*