**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-6488**

JAMES EARL RICHARDSON,

        Petitioner - Appellant,

   v.

SUPERINTENDENT JOYCE KORNEGAY,

        Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina at Raleigh. Louise W. Flanagan, District Judge. (5:16-hc-02115-FL)

Argued: March 9, 2021                      Decided: July 8, 2021

Before GREGORY, Chief Judge, and AGEE and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Chief Judge Gregory and Judge Agee joined.

**ARGUED:** Lide E. Paterno, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellant. Nicholaos George Vlahos, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Heather L. Rattelade, RICHARDSON LAW FIRM, PLLC, Fayetteville, North Carolina; Z.W. Julius Chen, Margaret O. Rusconi, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellant. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

In 2011, a North Carolina jury found James Richardson guilty on two counts of first-degree murder and two counts of discharging a firearm into an occupied building resulting in serious bodily injury. He was sentenced to two consecutive life sentences without the possibility of parole for the murder convictions (along with consecutive terms for the firearm convictions).

After his convictions were affirmed on appeal, Richardson unsuccessfully sought post-conviction relief in state court. So he filed a habeas petition in federal district court, *see* 28 U.S.C. § 2254, that raised three issues relevant here: (1) whether the trial court violated his due process right to present a defense by excluding his eyewitness-identification expert, (2) whether his trial counsel provided him with ineffective assistance by failing to secure the admissibility of that expert's testimony, and (3) whether the jury's verdict was impermissibly motivated by racial animus. Applying the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act of 1996, the district court dismissed his petition.

Richardson now asks us to reverse the district court's decision or, in the alternative, vacate it and remand for an evidentiary hearing. But finding his ineffective-assistance claim procedurally barred and his other claims without merit, we affirm the district court's denial of his habeas petition.

## I. Background

### A. The trial

Richardson's convictions stem from a drive-by shooting that occurred outside a nightclub in Greenville, North Carolina, around 2:00 a.m. on June 30, 2009. Near closing time, Richardson scuffled with another patron and was escorted out of the club by several bouncers. Once outside, he scuffled with the club's staff, told them that he would be back, and threatened to kill them. One witness saw him mimic a gun with his hands.

Amid the commotion, Richardson broke loose from the fray and walked away from the club to a white BMW, on loan from a friend, he had parked nearby. He retrieved a gun from the trunk, cocked it, and got into the vehicle on the driver's side.

Moments later, a white BMW, coming from the direction Richardson had walked after he had been escorted out of the club, sped the wrong way down a one-way road toward the club. As the car zoomed by, witnesses saw a man in a white shirt fire multiple gunshots through the car's window in the direction of the club. Two of those bullets struck and killed a twenty-one-year-old college student and a manager of a local pizza restaurant. The white BMW was later found on the street outside Richardson's mother's house.

Richardson fled the state, but, several days later, turned himself in to the police. Richardson was charged with two counts of first-degree murder and two counts of discharging a firearm into an occupied building and was ultimately tried on those charges.

His trial focused almost exclusively on the identity of the shooter in the BMW. Various witnesses described both Richardson and the shooter as wearing a white t-shirt on the evening of the murders. And one, Vidal Thorpe, testified that he saw Richardson's face

3

and arm as the BMW drove by. Officers also recovered an unfired bullet, Richardson's photo-identification card, receipts in Richardson's name, Richardson's latent fingerprints and palm prints, and Richardson's DNA from the BMW. Testimony established that the bullets recovered from the scene had been fired from a Hi-Point .45 caliber handgun, the same brand and caliber as a firearm that Richardson owned.

The defense called several witnesses who testified that Richardson was not the person who fled the altercation outside the club; the shooter used a gun unlike the one Richardson had owned; the shooter's appearance was quite different from Richardson's; there were at least two people in the car; the shooter was not Richardson; and Richardson had not been driving a BMW that night.

Richardson also sought to admit the expert testimony of Dr. Lori Van Wallendael, a professor with expertise in "applied memory issues," "eyewitness face recognition, voice recognition, [and] testimony in a forensic setting." J.A. 1988. To prepare for her testimony, Dr. Van Wallendael had reviewed witness statements, police reports, lineup identifications, and some transcripts from testimony given at a suppression hearing. She also visited the crime scene at night to "get a feel for what the lighting might have been like and what the distances were involved from where the various witnesses had said they were standing and walking." J.A. 1990. She interviewed no witnesses but observed the in-court testimony of at least eight government witnesses. She did not observe the testimony of Thorpe, the only witness to positively identify Richardson as the shooter in the BMW, or the testimony of any of the defense's eyewitnesses who presented conflicting accounts of what happened that night.

4

In support of Dr. Van Wallendael's testimony, defense counsel submitted a written memorandum along with copies of two cases from North Carolina and one from Utah. While largely relying on that written submission, defense counsel explained that the testimony was important because the case was "particularly eyewitness identification heavy." J.A. 2009. He agreed that the admission of this type of witness was "in the discretion of the Court." *Id.* But Dr. Van Wallendael, counsel stressed, had reviewed all the statements and gone to the crime scene. Even so, counsel acknowledged that some courts found it important for an eyewitness-identification expert to speak to the witnesses, something that counsel said was impossible given timing and the presence of State witnesses under subpoena. And defense counsel acknowledged that the expert had not seen all the trial testimony of the eyewitnesses but stressed that should only limit what could be asked of the expert. Taken together, defense counsel argued that the expert's preparation and background justified permitting her testimony.

The prosecution opposed admitting Dr. Van Wallendael's testimony. The decision, the government agreed, was within the court's discretion but the government explained that Dr. Van Wallendael had not interviewed each witness and had not heard every eyewitness' trial testimony. So the prosecution argued that the testimony would be prejudicial and confusing to the jury.

After taking a break to review the written materials provided by defense counsel, the court excluded the testimony. The court found that the expert had visited the scene and reviewed the statements and lineup materials but had neither interviewed all the witnesses nor observed all the eyewitness testimony. The trial court then concluded that the probative

5

value "of her testimony considered in the light most favorable to the Defendant, is outweighed by the danger that the testimony . . . would confuse the jury, that it would be unduly prejudicial in the Defendant's favor and that it would not be of significant assistance to the jury." J.A. 2012–13.

Proceeding without Dr. Van Wallendael's testimony, the jury convicted Richardson on two counts of murder and two counts of discharging a firearm into an occupied building inflicting serious bodily injury. The court sentenced Richardson to consecutive life sentences plus a consecutive 98 to 136 months in prison.

## B.     Direct appeal

On direct appeal, Richardson argued, among other things, that the trial court violated his constitutional right to present a defense by excluding Dr. Van Wallendael's testimony. *State v. Richardson*, 738 S.E.2d 830, at *2–3 (N.C. Ct. App. 2013) (unpublished table decision). The appeals court rejected that argument, holding that the trial court did not abuse its discretion in finding Dr. Van Wallendael's testimony unfairly prejudicial because "she did not interview the witnesses and did not hear all of the in-court testimony, particularly the testimony of the defense witnesses and Thorpe[,]" and, as such, "she would have only testified about the reliability of the State's witnesses' identification." *Id.* at *3. The Supreme Court of North Carolina declined discretionary review. *State v. Richardson*, 743 S.E.2d 198 (N.C. 2013).

## C.     State post-conviction proceedings

Next, Richardson applied for post-conviction relief in state court by filing a Motion for Appropriate Relief. *See* N.C. Gen. Stat. § 15A-1415(b)(3). He argued, among other

6

things, that (1) his "trial counsel was ineffective by failing to ensure their expert had performed the necessary tasks to be permitted to testify," J.A. 2508, (2) the jury's verdict was improperly infected with racial animus as evidenced by statements made to juror Lamuel Anderson during deliberations, J.A. 2531–34, and (3) newly discovered evidence from his brother, Andre, established that he was innocent of the crimes, J.A. 2524–30.

The court denied Richardson's motion. It concluded that his ineffective-assistance claim was procedurally barred under North Carolina law because Richardson had not brought the claim during his direct appeal even though he was "in a position to adequately" do so. J.A. 65–67; *see* N.C. Gen. Stat. § 15A-1419(a)(3) (establishing that post-conviction relief may be denied if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so"); *see also State v. Fair*, 557 S.E.2d 500, 525 (N.C. 2001) ("[T]o avoid procedural default . . . defendants should necessarily raise those [ineffective assistance of counsel] claims on direct appeal that are apparent from the record."). And because Richardson failed to explain why he did not raise the claim during his direct appeal or attempt to establish cause and prejudice to excuse his default, the post-conviction court could not reach its merits. J.A. 65–67.

As for the racial-animus claim, Richardson submitted two affidavits in support of this argument. *See* J.A. 2538–41, 2543–46. In the first, a law student who assisted in Richardson's defense affirmed that Anderson told him about the pressure he felt from other jurors to change his vote from not guilty to guilty and his desire to be removed from the jury. J.A. 2538–39. The second, from Anderson himself, recounted the hostility during

7

deliberations. J.A. 2543–46. On the fourth day of deliberations, Anderson continued to believe that Richardson was not guilty, even though the other jurors had voted to convict. J.A. 2545. So he was "bombarded by the other hostile jurors who spoke to [him] in a demeaning fashion, questioned about whether or not [he] kn[e]w the Richardson family, and whether or not [he] was pleading NOT Guilty because [he was] a black male around Richardson's age." J.A. 2545–46. "[S]tressed by the hostile attitude of the jurors towards [him]," Anderson ultimately "caved" even though he believed "100% that James Richardson was not guilty." J.A. 2546.

The court discounted the law student's affidavit because it contained hearsay statements made "by an affiant with no personal knowledge of the . . . events described" and Richardson did not contend that an exception to the hearsay rule applied. J.A. 67–68. The court also found that Anderson's affidavit did not describe juror misconduct and was therefore insufficient to impeach the jury's verdict because "[t]he arguments, statements, discussions, emotional, and mental reactions of jurors are protected from attack." J.A. 73 (citing N.C. R. Evid. 606(b) and N.C. Gen. Stat. § 15A-1240).

Finally, the court rejected Richardson's actual-innocence claim, finding that his brother's affidavit was "inconsistent with all believable and credible eyewitness testimony, video evidence, and forensic evidence introduced at trial" and that Richardson "failed to

8

present any evidence of due diligence employed to procure Andre's testimony" at the time of trial, "as required by N.C. Gen. Stat. § 15A-1415(c)." J.A. 71.[1]

And so the court denied his motion for relief. J.A. 74. The North Carolina Court of Appeals denied review. J.A. 76.

### D. Federal habeas proceedings

Richardson then filed a federal habeas petition under 28 U.S.C. § 2254. In his petition, he argued that the state courts' resolution of his claims were unreasonable applications of federal law and that the North Carolina statute the post-conviction court cited to find his ineffective-assistance claim procedurally barred was not an adequate and independent state ground on which that disposition rested.

The State moved for summary judgment. In response, Richardson submitted new affidavits from Anderson, Anderson's wife, his trial counsel, and his direct-appeal counsel. *See* J.A. 2718–30, 2749–50. The district court granted the State's motion to strike Anderson and Anderson's wife's affidavits but denied as to Richardson's prior counsel's affidavits. *Richardson v. Kornegay*, No. 5:16-HC-2115-FL, 2017 WL 1133289, at *3–4 (E.D.N.C. Mar. 24, 2017).

---

[1] Andre's affidavit explained that he and Richardson had driven separately to the bar. J.A. 2552. After the scuffle at the club, Andre claimed that he had grabbed the keys to the BMW, which Richardson had driven to the club, and handed them to "B," one of their mutual friends. *Id.* Then, after the brawl outside the club, Richardson and Andre passed the BMW; Andre saw no one inside. Richardson entered a brown Cadillac and drove off and Andre drove off in his own car. J.A. 2553. After stopping by friend Damian Phillip's house, Andre went to his and Richardson's mother's house. *Id.* Richardson was there, but the BMW was not. *Id.* Andre, Richardson, and two others then drove to Raleigh for the night. *Id.* One of those riding with Andre testified at trial, and his testimony squarely contradicted Andre's story. J.A. 579–80.

Without holding an evidentiary hearing, the district court granted summary judgment to the State, *Richardson*, 2017 WL 1133289, at \*16, and Richardson timely appealed, J.A. 2849. Having jurisdiction over the case under 28 U.S.C. § 1291, we granted a certificate of appealability, *see* 28 U.S.C. § 2253(c), to determine whether (1) Richardson's due process rights were violated by the exclusion of Dr. Van Wallendael's testimony; (2) Richardson's ineffective-assistance claim is well-founded on the merits and not procedurally barred; and (3) the jury's verdict was improperly influenced by racial animus, J.A. 2851.

## II. Discussion

"We review a district court's denial of habeas relief de novo and its decision not to grant an evidentiary hearing for abuse of discretion." *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). Under the Antiterrorism and Effective Death Penalty Act of 1996, we must review a state court's resolution of any claims it "adjudicated on the merits" deferentially, only granting relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2). By contrast, a state court decision resolving a claim that was not "adjudicated on the merits" is reviewed de novo, *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (citing *Winston v. Pearson*, 683 F.3d 489, 499 (4th Cir. 2012)), unless the state court found the claim procedurally defaulted, *Prieto v. Zook*, 791 F.3d 465, 468 (4th Cir. 2015). We may only review procedurally defaulted claims to determine whether the petitioner has

10

shown that he falls within an exception that permits us to review the claim's merits. *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998); *Williams v. French*, 146 F.3d 203, 217 (4th Cir. 1998).

## A.     Exclusion of Dr. Van Wallendael's testimony

Because the North Carolina Court of Appeals adjudicated Richardson's evidentiary claim on the merits, *Richardson*, 738 S.E.2d 830, at \*2–3, we review its decision with deference, *see* 28 U.S.C. § 2254(d).  Richardson argues that the appeals court's decision was *both* an "unreasonable application[] of clearly established Federal law" *and* "based on an unreasonable determination of the facts." *Id.*  But he does not identify any facts that the appeals court incorrectly determined.  So we will only review whether the appeals court reasonably applied clearly established federal law.

The trial court excluded Dr. Van Wallendael's testimony under North Carolina Rule of Evidence 403,[2] which parallels the Federal Rule of Evidence 403.  *See State v. Mason*, 340 S.E.2d 430, 435 (N.C. 1986).  The state appeals court affirmed, concluding that the trial court had not abused its discretion in finding Dr. Van Wallendael's testimony unfairly prejudicial to the State and therefore more prejudicial than probative.  *Richardson*, 738 S.E.2d at \*3.

We do not generally review state-court determinations of state-law questions, like the admissibility of evidence.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  Our

---

[2] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  N.C. R. Evid. 403.

11

jurisdiction is strictly circumscribed. We only have federal-question jurisdiction if the alleged error violated the *federal* "Constitution, laws, or treaties." *Id.* So to obtain our review of this state-law question, Richardson must establish either that the error was "so extreme as to result in the denial of a constitutionally fair proceeding" or that it "infring[ed] specific constitutional protections." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (first quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000); and then quoting *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993)).

Understanding this requirement, Richardson argues that excluding Dr. Van Wallendael's testimony violated his constitutional right to "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). At minimum, that right includes the "right to put before a jury evidence that might influence the determination of guilt." *United States v. Lighty*, 616 F.3d 321, 358 (4th Cir. 2010) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). And he argues that Dr. Van Wallendael's testimony pointing out the potential inaccuracy of the eyewitness identifications would have been a critical part of his defense.

But the right to present a defense has limits. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes*, 547 U.S. at 324 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). One permissible rule is Rule 403, which in both federal and North Carolina courts "permits judges to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Id.* at 326–27 (cleaned

up). Thus, discretionary decisions under Rule 403 generally lack constitutional implications.

Despite that, even if a rule itself is constitutional, its application in a specific circumstance may still violate the Constitution if it "infring[es] upon a weighty interest of the accused" and is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" *Id.* at 324 (quoting *Scheffer*, 523 U.S. at 308); *see id.* at 327–31 (finding unconstitutional an application of a normally valid rule).

Recognizing that North Carolina Rule 403 is generally constitutional, Richardson instead contends that the appeals court's *application* of that rule violates his constitutional right to present a defense. He understands the appeals court to have "reduc[ed] the otherwise permissible balancing of probative value and prejudice to a per se rule that an eyewitness-identification expert cannot testify if she has not observed both parties' eyewitnesses' live testimony." Appellant's Br. 19. And he argues that per se rule is "arbitrary or disproportionate to its purpose of guarding against substantial unfair prejudice." *Id.*

But that argument mischaracterizes North Carolina law and the appeals court's opinion. First, the admissibility of expert testimony on eyewitness identifications "is generally at the court's discretion, both under federal and *North Carolina law*." *Moore v. Hardee*, 723 F.3d 488, 497 (4th Cir. 2013) (emphasis added) (citing, among other things,

13

*State v. Cotton*, 394 S.E.2d 456, 459–60 (N.C. Ct. App. 1990), *aff'd on other grounds*, 407

S.E.2d 514 (N.C. 1991)).[3]

And the appeals court's ruling here relied on that discretion, not a per se rule. Sitting

as a federal habeas court, we must identify "the particular reasons—both legal and

---

[3] Richardson fails to identify the source of any alleged per se rule, and the two cases the appeals court cites in its discussion show that one does not exist. *Richardson*, 738 S.E.2d at *3 (citing *Cotton*, 394 S.E.2d 456; *State v. Suddreth*, 412 S.E.2d 126 (N.C. Ct. App. 1992)). In *Cotton*, the appeals court affirmed the exclusion of expert testimony about the accuracy of eyewitness identifications. 394 S.E.2d at 459–60. The expert planned to testify that "lighting, stress, cross-racial identification, priming of memory, unconscious transfer, and loss of memory over time" could affect eyewitness identifications. *Id.* at 459. The appeals court held that the trial court had properly found that testimony was relevant but "minimal[ly] valu[able]" to the jury because lay people are aware of and generally comprehend the factors that affect the accuracy of eyewitness identifications. *Id.* at 459–60. And it agreed with the trial court that the evidence was "unduly prejudicial" to the State. *Id.* There was no sign that the affirmance rested on a rule—per se or otherwise—that the expert must observe all the witnesses' testimony.

The same is true of *Suddreth*, 412 S.E.2d 126. In that case, the appeals court affirmed the exclusion of expert testimony about the "factors affecting the reliability of eyewitnesses identification." *Id.* at 132–33. The district court had excluded the testimony because it was not case specific, was probative but not indispensable, would confuse the jury, and would not help the jury resolve the case. *Id.* at 132–33. The appeals court deferred to that ruling, noting that the expert had not interviewed the victim or observed her in-court testimony and did not visit the crime scene. *Id.* at 133 ("The only basis for Dr. Long's testimony was his review of the transcript of the victim's testimony."). The court did not suggest that it was applying a per se rule that eyewitness-identification experts must always observe the in-court testimony of every eyewitness. But in that case, where there was a single eyewitness to the crime and the expert had not availed himself of various opportunities to acquire case-specific knowledge, the probative value of the expert's testimony was substantially outweighed by the risk of undue prejudice and jury confusion.

These cases reflect a deference to the discretion trial courts wield, not a per se rule. Nothing about these cases would preclude a trial court from balancing the evidence differently and coming to a different conclusion and the appeals court affirming that decision. And even if the state court just relied on the fact that the expert did not observe every in-court witness, that would not necessarily be a per se rule. The balance in that particular case may have permitted such a conclusion within the trial court's discretion but it might not in a different case.

14

factual—why state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (quoting *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)). And the particular reason for rejecting this claim was that the trial court did not "abuse its discretion" in excluding Dr. Van Wallendael's testimony. *Richardson*, 738 S.E.2d at *3. Neither the trial court nor the appeals court said it was adopting a per se rule or requiring review of each eyewitness. Instead, the rationale supporting finding no abuse of discretion was multifaceted: (1) Dr. Van Wallendael interviewed no witnesses, (2) she did not hear all the witnesses' in-court testimony, and (3) she did not intend to testify about the reliability of the defense's eyewitnesses. *Richardson*, 738 S.E.2d at *3.

Nowhere did the appeals court purport to solely base its conclusion on the fact that Dr. Van Wallendael did not observe every witness's in-court testimony. Instead, the court focused on the *specific* witnesses Dr. Van Wallendael did not observe in court: Thorpe, the only eyewitness to identify Richardson by name, who was the same race as Richardson, had consumed "virtually no[]" alcohol that evening, and had little or no exposure to media reports before coming forward with his account, J.A. 2007, and the defense witnesses, two of whom gave "virtually identical" testimony and one of whom had consumed eight beers that night, J.A. 2007–08. If the appeals court was applying a per se rule requiring an expert to observe every in-court witness, it would have been unimportant *which* witnesses Dr. Van Wallendael did not observe. But at least part of the court's reasoning hinges on that very detail. *Richardson*, 738 S.E.2d at *3 ("[S]he did not interview the witnesses and did

15

not hear all of the in-court testimony, *particularly the testimony of the defense witnesses and Thorpe's testimony*." (emphasis added)).

The deference we afford to the state court here "demands that [its] decision[] be given the benefit of the doubt." *Richardson v. Branker*, 668 F.3d 128, 140–41 (4th Cir. 2012) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The exercise of discretion, not any per se exclusionary rule, led to the exclusion of Dr. Van Wallendael's testimony. Far from being so unreasonable as to violate clearly established due process rights, the state court's rejection of Richardson's claim falls well within the range of what reasonable jurists do. *See United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012); (holding that the trial court did not abuse its discretion in excluding expert testimony about eyewitness identification); *accord United States v. Harris*, 995 F.2d 532 (4th Cir. 1993); *United States v. Baylor*, 537 F. App'x 149, 158 (4th Cir. 2013); *United States v. Bellamy*, 26 F. App'x 250, 259 (4th Cir. 2002).[4] The state court's determination that the trial court

---

[4] Courts considering the admissibility of eyewitness expert testimony appear to balance the testimony's fit to a case and the undue prejudice that may result from it. Some courts prefer eyewitness expert testimony that is tailored specifically to the eyewitnesses in the case in order to avoid a lecture on the generalities of eyewitness reliability. *See Robertson v. McCloskey*, 676 F. Supp. 351, 354 (D.D.C. 1988); *Pierce v. State*, 777 S.W.2d 399, 415–16 (Tex. Crim. App. 1989); *United States v. Fosher*, 590 F.2d 381, 382–83 (1st Cir. 1979). Other courts prefer eyewitness expert testimony to be general to prevent the expert from usurping the jury's role as fact finder. *See People v. McDonald*, 690 P.2d 709, 719–20, 722 (Cal. 1984), *overruled on other grounds by People v. Mendoza*, 4 P.3d 265 (2000); *State v. Chapple*, 660 P.2d 1208, 1219 (Ariz. 1983). Still others have emphasized that proponents of expert testimony must find a balance between testimony that is too specific and testimony that is too general. *See State v. Clopten*, 223 P.3d 1103, 1107 (Utah 2009). We take no position on the right balance between fit and prejudice, but merely note that North Carolina's approach falls within this permissible spectrum. *Cf. Scheffer*, 523 U.S. at 311–12 (finding that various federal and state courts adopted different rules to (Continued)

16

was not disproportionate or arbitrary in excluding expert testimony under Rule 403 was not an unreasonable application of clearly established federal law. So we deny Richardson relief on this claim.[5]

## B. Ineffective assistance of counsel

Along with his prior claim, Richardson brings an ineffective-assistance-of-counsel claim, arguing that a competent lawyer would have ensured that Dr. Van Wallendael had

---

handle the admissibility of polygraphs and concluding that the military's rule of per se exclusion was not arbitrary or disproportionate).

[5] And even were the state court's evidentiary exclusion so unreasonable as to violate due process, it was not prejudicial considering the overwhelming evidence of guilt presented. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (An error committed by a state court only entitles a petitioner to habeas relief if the error "had substantial and injurious effect or influence in determining the jury's verdict." (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Besides the eyewitnesses that Dr. Van Wallendael observed, the state produced evidence that: (1) Richardson threatened the bouncers at the club after a fight and then left; (2) shortly after, a white BMW drove by and shot at the club; (3) physical evidence connected Richardson to the BMW used in the shooting; (4) Richardson admitted and others confirmed that he was using the car earlier that night on loan; (5) the car was found the next morning at Richardson's mother's home; (6) gunshot residue and a spent .45 caliber shell were found in the car—the same caliber used in the shooting and found at the scene; (7) a firearms expert testified that the shells and bullets had characteristics matching the use of a Hi-Point brand firearm; (8) Richardson had purchased a .45 caliber Hi-Point handgun and the FBI had found him with it previously; (9) after the shooting Richardson fled the state; and (10) he repeatedly called his friend Officer Moore and asked if he had "f'd up." This is on top of the various eyewitnesses who collectively claimed to see Richardson throughout the night, saw him walk toward the BMW, get a handgun out of the trunk, drive toward the bar, and shoot out the window. Even if Dr. Van Wallendael's testimony was admitted, it is unlikely that it would have completely undermined the testimony of these eyewitnesses and whatever damage done would also have weakened Richardson's own witnesses. Moreover, Professor Van Wallendael did not observe Thorpe, who was a Black witness who saw Richardson throughout the night, knew him from before the incident, had little to drink, and positively identified him as the shooter with an accurate description. All of this evidence would be overwhelming regardless of Dr. Van Wallendael's testimony.

17

satisfied the requirements necessary for her testimony to be admitted. But Richardson did not raise this claim on direct appeal. He first raised it before the state post-conviction court. And that court found the claim procedurally barred because Richardson "was in a position to adequately raise" it during his direct appeal but "did not do so." J.A. 67; *see* N.C. Gen. Stat. § 15A-1419(a)(3).

A federal habeas claim is procedurally defaulted when a state court employs an adequate and independent state-law procedural ground to decline to consider the merits of the claim. *Prieto*, 791 F.3d at 468. We have "repeatedly held" that the procedural rule employed by the state post-conviction court here, N.C. Gen. Stat. § 15A-1419(a)(3), is an "adequate and independent" state-law ground on which a state court may deny a claim. *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010); *accord Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008). On habeas review, we cannot question the state court's application of its own procedural rules resulting in a procedural default. *See Sharpe*, 593 F.3d at 377; *Burket*, 208 F.3d at 184; *see also Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995) ("[S]tate procedural default finding is binding on a federal court.").[6] We

---

[6] Richardson points to two of our cases that appear to suggest that we must independently assess whether the state court correctly found his claim procedurally defaulted under state law. Those cases do not control here.

The first, *Fowler v. Joyner*, purports to require federal habeas courts to apply state law to determine whether particular ineffective-assistance-of-counsel claims have been procedurally defaulted. 753 F.3d 446, 463 (4th Cir. 2014) ("[T]he federal habeas court will still be called upon to determine, on a case-by-case basis, whether the particular ineffective-assistance-of-trial-counsel claim identified, regardless of its merit, is nonetheless procedurally defaulted because it could have been and should have been raised on direct appeal."). But that case required that analysis when a federal habeas court is considering whether a petitioner has established cause under *Martinez v. Ryan*, 566 U.S. 1 (Continued)

may only consider whether the petitioner has established that he falls within an exception to save his claim from the consequences of his default. *Fisher*, 163 F.3d at 844; *French*, 146 F.3d at 217. Richardson has not.

We excuse a procedural default in two circumstances: (1) when the petitioner establishes "cause and prejudice" for the default; or (2) when the default would result in a "fundamental miscarriage of justice." *Prieto*, 791 F.3d at 469 (quoting *Mackall v. Angelone*, 131 F.3d 442, 445 (4th Cir. 1997)). Richardson has not argued on appeal that

---

(2012), to excuse his procedural default, not when the court is determining whether the claim was procedurally defaulted in the first instance. *Id.* at 460–63. There is no claim that appellate counsel was ineffective here, so *Martinez* cannot provide an exception to the rule that we cannot question a state court's finding of procedural default based on its own rules. *See Sharpe*, 593 F.3d at 377; *Burket*, 208 F.3d at 184.

The second case, *Lawrence v. Branker*, admittedly considers whether the state-court's procedural default ruling was correct. 517 F.3d at 715. But it did so in agreeing with the state court. And regardless, doing so conflicted with copious older precedent restricting our review of that question. *See, e.g.*, *Burket*, 208 F.3d at 184; *Fisher*, 163 F.3d at 844; *French*, 146 F.3d at 217. And when "published panel opinions are in direct conflict on a given issue, the earliest opinion controls." *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004). So *Lawrence*'s approach does not control in this case.

In the alternative, Richardson argues that the State waived the argument that the state court's procedural-default ruling was unreviewable by arguing below that the default ruling was correct. But the State argued below that the claim was procedurally defaulted. J.A. 2648–52. And the consequence of that argument, which stems from our caselaw, is that we may not review the state court's ruling on that point. The State's arguments below and on appeal that the ruling was correct does not change that. And even if the State had not argued procedural default, "we possess discretion to decline to consider the merits of a defaulted claim notwithstanding." *Hudson v. Hunt*, 235 F.3d 892, 895 n.1 (4th Cir. 2000). Given that the State recognized the procedural default and Richardson had the opportunity to address the exceptions to procedural default, we would decline to consider the ineffective-assistance claim on the merits. *See id.* But even if we considered Richardson's ineffective-assistance-of-counsel claim on the merits, it would likely fail. *See infra* note 8.

19

the cause-and-prejudice exception applies and has therefore waived it.[7] *See United States v. Palacios*, 677 F.3d 234, 244 n.5 (4th Cir. 2012). And while he now seeks to rely on the fundamental-miscarriage-of-justice exception, he made no such claim before the district court. *See Hicks v. Ferreyra*, 965 F.3d 302, 309 (4th Cir. 2020). Although Richardson argued that he is actually innocent of the crimes he was convicted of before the district court, he did so as a standalone actual-innocence claim. J.A. 2711–13 (acknowledging that it is an "open" question whether his freestanding actual-innocence claim is cognizable in federal habeas). He did not argue that his innocence serves as a gateway by which we must excuse his procedural default and address his ineffective-assistance claim on the merits. *See Schlup v. Delo*, 513 U.S. 298, 314–15 (1995) (explaining the difference between freestanding actual-innocence claims and gateway actual-innocence claims). We therefore do not consider that claim on appeal.

Because Richardson has not established that either exception applies to excuse his procedural default, we decline to reach the merits of his ineffective-assistance claim. In doing so, we also find that the district court did not abuse its discretion by not granting Richardson an evidentiary hearing on this claim. *See Schriro v. Landrigan*, 550 U.S. 465,

---

[7] Although Richardson acknowledges the cause-and-prejudice exception, he does not pursue the argument. Instead, he raises the separate point that the state court failed to properly apply its own law. Appellant's Br. 40 (arguing "section 15A-1419(a)(3) does not provide an adequate state ground for dismissal of Richardson's ineffective assistance claim"). And this separate point is one we cannot consider. *See Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998).

474 (2007) ("It follows that if the record . . . precludes habeas relief, a district court is not required to hold an evidentiary hearing.").[8]

## C. Racial animus

Richardson also argues that the jury's verdict resulted from racial animus in violation of *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). He contends that we must review this claim de novo because the state court foreclosed its factual development and therefore did not adjudicate it on the merits.[9] We disagree.

---

[8] And even if we were to consider the question further, the overwhelming evidence against Richardson would defeat any exception to procedural default and his ineffective-assistance-of-counsel claim on the merits. *See supra* note 5. First, "cause and prejudice" requires that "errors at his trial . . . worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012) (quoting *Wolfe v. Johnson*, 565 F.3d 140, 158 n.27 (4th Cir. 2009)). Here, "the overwhelming evidence of guilt presented by the prosecution negated any reasonable possibility of actual prejudice." *Waye v. Townley*, 871 F.2d 18, 21 (4th Cir. 1989). Second, a "fundamental miscarriage of justice" arises only in a "narrow class of cases" where a "constitutional violation has probably resulted in the conviction of one who is actually innocent," which requires the petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 315, 322, 327 (1995). This standard requires a "stronger showing than that needed to establish prejudice." *Id*. at 327. Since Richardson cannot even show prejudice, he cannot meet this higher standard even considering his brother's questionable affidavit. *Cf. Mueller v. Angelone*, 181 F.3d 557, 585 (4th Cir. 1999). Finally, even if we were to reach the merits, Richardson cannot show prejudice due to the overwhelming evidence against him. *Owens v. Stirling*, 967 F.3d 396, 421 (4th Cir. 2020) (explaining that "any deficiency in counsel's failure to [ ] object wasn't prejudicial in light of the overwhelming evidence"). Moreover, counsel cannot be ineffective for not knowing about a per se rule requiring eyewitness experts to observe all in-court testimony because, as we explained earlier, there is no per se rule and the court did not rely on one here.

[9] The State contends that Richardson waived this argument by not raising it below. But "[o]ur case law is clear that 'parties cannot waive the proper standard of review by failing to argue it.'" *United States v. Venable*, 943 F.3d 187, 192 (4th Cir. 2019) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018)).

Structure is fundamental in habeas. So we must formalistically march through each step of the habeas analysis to determine whether relief is appropriate. First, we must decide whether the state court adjudicated Richardson's claim on the merits. *Gordon*, 780 F.3d at 202. If the state court did adjudicate the claim on the merits, then we apply § 2254(d)(1)'s deferential standard of review and ask only whether the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." If the state court did not adjudicate Richardson's claim on the merits, then we review the claim de novo (unless the claim was procedurally defaulted, as discussed above). But we must then consider whether *Teague* erects an independent barrier against retroactively applying *Pena-Rodriguez* to Richardson's collateral habeas attack on his conviction. *Teague v. Lane*, 489 U.S. 288, 310 (1989) ("Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those [collateral-review] cases which have become final before the new rules are announced."). Although these steps do not always turn on the same question, here they do: whether the constitutional rule announced in *Pena-Rodriguez* was established when the state court adjudicated Richardson's claims. So to decide Richardson's claim, we must look to the history of *Pena-Rodriguez* and the general bar on the use of testimony about a jury's deliberations to impeach that jury's verdict.

The no-impeachment rule began in England before the ratification of the Sixth Amendment. *See Pena-Rodriguez*, 137 S. Ct. at 863 (citing *Vaise v. Delaval*, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785)). Although states had variations on this rule early in the

22

Republic's history, the states eventually coalesced around Mansfield's Rule, which bars testimony about jury deliberations except to demonstrate that the jury was subjected to an extraneous influence. *See id.* at 873 (Thomas, J., dissenting). The Supreme Court explicitly adopted this more restrictive rule in *McDonald v. Pless*, 238 U.S. 264, 266–69 (1915), which became known as the federal rule. In doing so, the Court explained some of the long-held justifications for the no-impeachment rule: the justice system has a strong interest in protecting the finality of jury verdicts, encouraging open deliberations in the jury room, and preventing the harassment of jurors by litigants seeking to overturn the verdict. *Id*. at 267–68; *Pena-Rodriguez*, 137 S. Ct. at 865 (noting the importance of these goals). And in 1975 the political branches agreed, passing Federal Rule of Evidence 606(b) after an extensive debate over competing versions and the longstanding policy goals of the no-impeachment rule. *Pena-Rodriguez*, 137 S. Ct. at 864–65. Rule 606(b)—as formulated by the Supreme Court and Congress—"prohibited the use of *any* evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences." *Warger v. Shauers*, 574 U.S. 40, 48 (2014) (citing Fed. R. Evid. 606(b)).[10]

---

[10] Federal Rule of Evidence 606(b) states:

(1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether:

(Continued)

23

Although the Supreme Court has acknowledged a possible exception to the rule in the "gravest and most important cases," *McDonald*, 238 U.S. at 269, the Court only addressed potential constitutional exceptions twice in the period after Rule 606(b) was enacted, but before *Pena-Rodriguez*, and rejected both. *See Pena-Rodriguez*, 137 S. Ct. at 866. First, in *Tanner v. United States*, the Supreme Court held that the Sixth Amendment does not require an exception for evidence of juror alcohol and drug use during trial. 483 U.S. 107, 126–27 (1987). As the Court said, "[b]y the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Id.* at 117. Exceptions to this common-law rule "were recognized *only* in situations in which an 'extraneous influence' was alleged to have affected the jury." *Id*. (quoting *Mattox v. United States*, 146 U.S. 140, 149 (1892)) (emphasis added) (internal citation omitted). Second, in *Warger v. Shauers*, the Supreme Court held that the Sixth Amendment does not require an exception for evidence that a juror lied about bias during voir dire. 574 U.S. at 44–48, 50–51. Those decisions heralded the no-impeachment rule as promoting jury-verdict finality and open discussion during jury deliberations. *Id.* at 49–50; *Tanner*, 483 U.S. at 120–21. So for most of American history, the Supreme Court had not found the potential constitutional exception to the no-impeachment rule that it alluded to in dicta.

---

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

24

In 2017, for the first time, the Supreme Court found a constitutional exception to the no-impeachment rule. In *Pena-Rodriguez*, the Supreme Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." 137 S. Ct. at 869. The Court recognized that this was a monumental shift in the law. For example, the Court noted that at the time 16 states judicially recognized an exception to the no-impeachment rule for evidence of racial bias. *Id*. at 865. On the federal side, the circuits were split on the question. *Id*. As these divides suggest, Supreme Court precedent did not dictate *Pena-Rodriguez*'s outcome. *See Butler v. McKellar*, 494 U.S. 407, 415 (1990) (a divide among lower courts suggests that a new rule was not "dictated" by Supreme Court precedent). And the majority acknowledged that the general no-impeachment rule was "centuries old" "with exceptions only where the jury had considered prejudicial extraneous evidence or was subject to other outside influence." *Pena-Rodriguez*, 137 S. Ct. at 861, 863–64. In reviewing its precedent, the Court agreed that it had rejected previous attempts to find a constitutional exception to the no-impeachment rule. *Id*. at 866.

Indeed, the *Pena-Rodriguez* majority stated that it was answering a question "left open" by its earlier precedent: Would the Constitution require an exception to the no-impeachment rule in some extreme case? *Id*. at 867. In considering that question the Court noted that prior statements suggesting that there might be such an exception "must be interpreted in context as [ ] guarded, cautious statement[s]. This caution is warranted to

25

avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect." *Id*. at 866–67. So finding any exception would have to be done with care.

The majority in *Pena-Rodriguez* engaged in this process by reviewing the intersection of two lines of precedent: decisions endorsing no-impeachment rules and decisions "seeking to eliminate racial bias in the jury system." *Id.* at 868. The two lines of precedent suggested different answers to the question presented, and until the decision issued, it was unclear which would prevail. The majority purported to reconcile the two lines of precedent to avoid a conflict, *id.*, but that does not mean that the principle it announced was "clearly established" before the opinion issued. Even considering the Court's racial-discrimination precedent, *Pena-Rodriguez*'s departure from the no-impeachment rule was "a startling development" given our justice system's centuries-long practice of respecting the privacy of the jury room. *Id.* at 875 (Alito, J., dissenting); *see id.* at 879 ("Today, for the first time, the Court creates a constitutional exception to no-impeachment rules.").

With this history in mind, we begin our march through the steps of habeas.

### 1.    Adjudication on the merits

As noted, our limited review of a state-court decision adjudicating a claim on the merits is highly deferential, respecting state courts as the principal forum for addressing challenges to state convictions. But we may ignore § 2254(d)'s deferential review where a state court substantively rejects a claim based "on a materially incomplete record." *Gordon*, 780 F.3d at 202 (quoting *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010)). A

26

record is "materially incomplete" if the state court "'*unreasonably* refuses to permit'" further factual development of the claim. *Id.* (quoting *Winston*, 683 F.3d at 496) (emphasis added). Richardson insists that is the case here. But a "state court does not unreasonably truncate further factual development when it declines to order discovery of a fact that it finds immaterial." *Valentino v. Clarke*, 972 F.3d 560, 578 (4th Cir. 2020). And that is what the state court did. So the record is not materially incomplete and we must defer to the state court.

When the state court considered Richardson's post-conviction claim, North Carolina law broadly prohibited the impeachment of a jury verdict.[11] Although North Carolina law listed specific exceptions to this rule, *see* N.C. Gen. Stat. § 15A-1240 ("evidence concerning whether the verdict was reached by lot"); *id.* (evidence that a juror was aware of matters not in evidence that violates defendant's right to confront the witnesses against him); *id.* (evidence of attempted or actual bribery or intimidation of a juror); N.C. R. Evid. 606(b) (a juror may testify about extraneous prejudicial information improperly brought to the jury's attention or outside influence improperly brought to bear on a juror), none encompassed instances of racial prejudice in the jury room, *see Pena-*

---

[11] "Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined." N.C. Gen. Stat. § 15A-1240(a).

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith." N.C. R. Evid. 606(b).

*Rodriguez*, 137 S. Ct. at 886 (Appendix excluding North Carolina from a list of states with codified or judicial exceptions for evidence of racial bias). And, as noted, the Supreme Court did not constitutionally mandate such an exception until nearly a year after the state post-conviction court's ruling. *Compare Warger*, 574 U.S. at 44–51, *with Pena-Rodriguez*, 137 S. Ct. at 869.

So at the time of the state post-conviction court's ruling, evidence of racial animus in the jury room, although concerning, was not relevant to any legally cognizable claim. As the state court recognized, Anderson's affidavit detailing the hostility he experienced during deliberations "d[id] not provide any legal justification" under the then-current law for impeaching the jury's verdict. J.A. 69. So we cannot say that the state court *unreasonably* truncated factual development of this claim. *Gordon*, 780 F.3d at 202. It merely adhered to the law that existed at that time and reasonably declined to order discovery on immaterial information.

So this claim was adjudicated on the merits in state court. We therefore apply the deferential standard of review mandated by § 2254(d).[12]

### 2. Clearly established law under § 2254(d)(1)

Richardson does not point us to any unreasonable factual determinations made by the state post-conviction court. *See* 28 U.S.C. § 2254(d)(2). So we consider only whether

---

[12] Because of this determination, we conclude that the district court correctly declined to consider juror Anderson's second and third affidavits and his wife's first affidavit, which were not presented to the state post-conviction court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

the state-court adjudication "resulted in a decision that *was* contrary to, or involved an unreasonable application of, *clearly established* Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). This plain text requires that we must judge the state court based on "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions *as of the time of the relevant state-court decision*." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (emphasis added); *see also Greene v. Fisher*, 565 U.S. 34, 38 (2011). We may not apply new Supreme Court decisions post-dating the state-court adjudication. *Greene*, 565 U.S. at 38; *see also Shoop v. Hill*, 139 S. Ct. 504, 507–09 (2019) (per curiam) (reversing Court of Appeals for relying on a Supreme Court decision that came years after the state-court adjudication to find an unreasonable application of clearly established law). The time at which we measure whether law was "clearly established"—when the state court makes its decision—is dispositive of Richardson's claim.

Richardson's post-conviction adjudication ended in 2016. As we stated previously, the "clearly established law" at the time of Richardson's state post-conviction adjudication did not allow the proffered testimony to impeach a verdict. In fact, it extolled the virtues of no-impeachment rules and rejected attempts to provide for constitutional exceptions to them. *Pena-Rodriguez* was not decided until a year later in 2017.

Seeking to evade our inevitable conclusion, Richardson argues that we should infer from *Tharpe v. Sellers*, 138 S. Ct. 545 (2018) (per curiam), that *Pena-Rodriguez* did not announce a new rule but merely crystalized clearly established law. In *Tharpe*, a habeas petitioner sought, after *Pena-Rodriguez*, to reopen his federal habeas proceedings

29

regarding his claim of racial bias in the jury. The district court denied his motion because, among other reasons, his claim had been procedurally defaulted in state court. *Id.* at 545. The Eleventh Circuit denied his subsequent application for a certificate of appealability, finding that reasonable jurists could not dispute that the district court's procedural ruling was correct. *Id.* at 546. The Supreme Court understood that denial to rest "solely" on the fact that the petitioner failed to show prejudice to excuse his procedural default. *Id.* And it thought that conclusion was incorrect. *Id.* So the Court vacated the Eleventh Circuit's judgment and remanded the case for further consideration. *Id.* at 546–47.

Richardson argues that by remanding, the Court in *Tharpe* implicitly found that *Pena-Rodriguez* was not a new rule. In support of this position, he maintains that if the rule had been new, the Supreme Court would have been precluded by *Teague*'s bar on retroactively applying new procedural rules on collateral review from granting the petitioner relief. *See Frazer v. South Carolina*, 430 F.3d 696, 705–06 (4th Cir. 2005).[13] But that implication, if ever warranted, does not exist here. *Tharpe* limited its decision to whether prejudice existed to overcome the procedural default. In doing so, the Court acknowledged that the district court denied the petitioner's motion on "several grounds"

---

[13] In *Frazer*, we first reviewed the existing precedent to hold that a prior Supreme Court decision was not a new rule but merely an application of well-settled law. 430 F.3d at 703–05. Only then did we note that our conclusion was confirmed by the Supreme Court's failure to address *Teague* in the procedural posture of the Court's prior decision. *Id.* at 705–06. We need not address here what weight any implication from silence we could draw from *Tharpe* could independently bear. *Cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

the Eleventh Circuit had not considered, and it "express[ed] no view of those issues," focusing instead on the sole ground the Eleventh Circuit based its conclusion on: procedural-default. *Tharpe*, 138 S. Ct. at 546.[14] One of the issues the Supreme Court declined to address was whether *Pena-Rodriguez* applied given the *Teague* retroactivity bar. *See Tharpe v. Warden*, No. 17-14027-P, 2017 WL 4250413, at *2–3 (11th Cir. Sept. 21, 2017). And, on remand after the Supreme Court reversed the procedural default finding, the Eleventh Circuit in fact held that *Pena-Rodriguez* did not apply retroactively. *Tharpe v. Warden*, 898 F.3d 1342, 1345–46 (11th Cir. 2018). So nothing about the Supreme Court's remand of *Tharpe* suggests by implication that *Pena-Rodriguez* was an old rule (which in turn might suggest that it was a clearly established rule under § 2254(d)(1)).

Having determined that no clearly established law when the state post-conviction court rejected Richardson's claim (that is, before *Pena-Rodriguez*) provided a racial-animus exception to the no-impeachment rule, we must then consider whether the state court's resolution of Richardson's claim reasonably applied the law that was clearly established at that time. The state court rejected Richardson's racial-animus claim after determining that Anderson's affidavit "solely recite[d] [] 'internal influences' of jury deliberations (*i.e.*, heated discussions, hostility, emotions, and stress)" that fell within the scope of North Carolina's no-impeachment rule. J.A. 73 (quoting N.C. R. Evid. 606(b)).

---

[14] Indeed, the dissent's main complaint was that the majority did not consider these alternative grounds, including the fact that the rule in *Pena-Rodriguez* was clearly not retroactive. *Id*. at 551 (Thomas, J., dissenting).

31

And because clearly established law at that time did not provide for constitutional exceptions to no-impeachment rules, that was not an unreasonable application of federal law. *See Shoop*, 139 S. Ct. at 506 (To qualify as an "unreasonable" application of federal law, "a state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011))). Any other conclusion is untenable. We simply may not find that the state court unreasonably applied law that did not exist at the time of its decision. *Id.* at 507–09.

### 3. *Teague*'s independent bar

Even were we to review Richardson's *Pena-Rodriguez* claim de novo, *Teague* erects an independent barrier to his claims. *Teague*, 489 U.S. at 310. This is because *Teague* bars the retroactive application of new rules, such as the one articulated in *Pena-Rodriguez*, unless the rule is substantive rather than procedural. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1562 (2021).[15] A rule is procedural, rather than substantive, when it affects "only the manner of determining the defendant's culpability," not the "range of conduct or class of persons that the law punishes." *Id.* at 1555 n.3 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)). And *Pena-Rodriguez* addresses the process for determining the defendant's guilt, not the range of conduct punished by the law. *See Tharpe*, 898 F.3d at

---

[15] The *Teague* bar applies to rules announced after direct review. *In re Thomas*, 988 F.3d 783, 788–89 (4th Cir. 2021). And the § 2254(d)(1) bar applies to rules announced after the relevant state-court decision, here the state post-conviction decision. *Williams*, 529 U.S. at 412. But the difference between these two dates makes no difference here, as the rule was not announced until after Richardson's conviction became final on direct review and after the state-post-conviction decision. *See Frazer*, 430 F.3d at 706 n.6.

1346 (finding that the rule announced in *Pena-Rodriguez* is procedural and does not apply retroactively); *In re Robinson*, 917 F.3d 856, 869 (5th Cir. 2019) (calling the contention of *Pena-Rodriguez* applying retroactively "exceedingly doubtful"); *cf. Teague*, 489 U.S. at 311, 314, 316 (holding that the rule announced in *Taylor v. Louisiana* requiring the jury venire be drawn from a fair cross section of the community is procedural and does not apply retroactively); *Allen v. Hardy*, 478 U.S. 255, 258–59, 261 (1986) (declining to apply *Batson*, which "changed the standard for proving unconstitutional" race-based "abuse of peremptory challenges," retroactively). So even were Richardson to get around § 2254(d)'s limits, his *Pena-Rodriguez* claim is barred by *Teague*.

So we affirm the district court's denial of Richardson's habeas petition. In doing so, we do not question the importance of the rule announced in *Pena-Rodriguez*. "[R]acial bias in the justice system" breeds "a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right." *Pena-Rodriguez*, 137 S. Ct. at 869. Far from discounting that principle, we merely hold today that the rule announced in that case was not "clearly established" at the time of Richardson's post-conviction proceedings nor can it be applied retroactively. We therefore cannot expect the state court to have applied it.

\* \* \*

To "further the principles of comity, finality, and federalism," *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003), and to protect the sovereignty of the states' criminal systems, *Harrington*, 562 U.S. at 102–03, habeas courts are constrained in their scope of review of

state-court decisions. The deference we must apply to those decisions dictates our conclusion in this case. Thus, the district court's denial of Richardson's habeas petition is

*AFFIRMED*.